**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 10 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JERRY LYNN McCRACKEN,

Petitioner-Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

Respondent-Appellee.

No. 00-5127

---

**Appeal from United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 97-CV-945-BU(M))**

---

David B. Autry, Norman, Oklahoma (Jon E. Brightmire, of Doerner, Saunders, Daniel & Anderson, Tulsa, Oklahoma, with him on the brief), for the appellant.

Jennifer B. Miller, Assistant Attorney General (W.A. Drew Edmondson, Attorney General, with her on the brief), Oklahoma City, Oklahoma, for the appellee.

---

Before **KELLY**, Circuit Judge**, BRORBY,** Senior Circuit Judge, and **BRISCOE**, Circuit Judge.

---

**BRISCOE**, Circuit Judge

---

Petitioner Jerry Lynn McCracken, an Oklahoma state prisoner convicted of four counts of first degree murder and sentenced to death, appeals the district court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

On the evening of October 13, 1990, after drinking and smoking marijuana with friends at an apartment in Tulsa, McCracken and co-defendant David Lawrence went to the Ferndale Lounge, where they drank heavily for several hours. Between approximately 12:40 and 12:55 a.m., they were overheard saying to each other that they weren't "afraid to fight nobody," weren't afraid "of getting an ass whuppin'," and weren't "afraid to shoot somebody." Tr. at 159. By approximately 12:55 a.m., only the bartender and five patrons, including McCracken and Lawrence, were in the bar.

A witness entered the bar at approximately 1:05 a.m. and found a man lying on the floor, covered in blood. The witness ran out of the bar and across the street to a convenience store, where he told three policemen what he had seen. The police found four victims inside the bar, all of whom appeared to have been shot in the head. Two of the victims were dead. The bartender (Carol McDaniels) and a third patron (Timothy Sheets) were transferred to a local hospital where they both died. An inventory of the bar revealed that $350 had been taken from the cash register, along with two beer pitchers and four beer mugs.

2

McCracken and Lawrence were arrested and charged with four counts of first degree murder. McCracken was also charged with one count of possession of a firearm after former conviction of a felony. Lawrence pled guilty to the four murder charges and was sentenced to four concurrent life sentences, plus twenty years. As part of his plea agreement, Lawrence agreed to testify at trial against McCracken.

At McCracken's trial, Lawrence testified it was McCracken's idea to rob the Ferndale Lounge. Although Lawrence agreed to participate in the robbery, he testified he was unaware that McCracken intended to kill anyone. According to Lawrence, McCracken stood up from the bar, pulled out a gun from his waistband, and announced, "This is a robbery." Tr. at 281. Lawrence testified that McCracken directed the bartender to give him the cash from the register, and directed Lawrence to pick up the mugs and pitcher from which they had been drinking. McCracken then shot the bartender and the three bar patrons.

McCracken testified in his own defense and disputed Lawrence's story. McCracken testified that, while at the bar, Lawrence asked if he could look at McCracken's pistol. McCracken testified he gave the gun to Lawrence. According to McCracken, approximately thirty minutes later, Lawrence started talking about how he would like to rob the bar. McCracken testified that Lawrence stood up, pointed the gun, and directed the bartender to give him the money from the register. McCracken testified that after the bartender gave Lawrence the money, Lawrence shot the three bar

patrons and the bartender.

The jury found McCracken guilty on the four murder charges and the felon in possession of a firearm charge. At the conclusion of the second-stage proceedings, the jury found the existence of all six aggravating factors alleged by the prosecution: (1) previous conviction of a felony involving violence; (2) that McCracken knowingly created a great risk of death to more than one person; (3) the murders were committed while McCracken was serving a sentence on a felony conviction; (4) the probability that McCracken was a continuing threat to society; (5) two of the murders (McDaniels and Sheets) were especially heinous, atrocious and cruel; and (6) the murders were committed for the purpose of preventing lawful arrest and prosecution.

The Oklahoma Court of Criminal Appeals (OCCA) affirmed McCracken's convictions and sentences on direct appeal, McCracken v. State, 887 P.2d 323 (Okla. Crim. App. 1994) (McCracken I), and the United States Supreme Court denied his petition for writ of certiorari. McCracken v. Oklahoma, 516 U.S. 859 (1995). McCracken filed an application for post-conviction relief which was denied by the OCCA. McCracken v. State, 946 P.2d 672 (Okla. Crim. App. 1997) (McCracken II).

On October 20, 1997, McCracken filed a pro se motion in federal district court requesting appointment of counsel to represent him in a federal habeas proceeding. The district court granted the motion and, on December 12, 1997, appointed counsel filed a "preliminary petition for writ of habeas corpus" asserting fourteen grounds for

4

relief. On February 11, 1998, appointed counsel filed an amended petition for writ of habeas corpus which, like the preliminary petition, asserted fourteen grounds for relief. On May 16, 2000, the district court denied McCracken's request for habeas relief. The district court subsequently granted a certificate of appealability (COA) with respect to four issues: (1) whether the trial court violated McCracken's constitutional rights by instructing the jury that McCracken was presumed "not guilty"; (2) whether trial counsel's performance was constitutionally deficient because of his failure to obtain and present evidence concerning mental health issues; (3) whether the trial court erred by failing to direct the jury to determine whether McCracken satisfied the death eligibility standards of Enmund v. Florida and Tison v. Arizona; and (4) whether the trial court violated McCracken's constitutional rights by failing to explain, in response to a question from the jury, the meaning of life imprisonment without parole. This court has granted a COA with respect to one additional issue: whether the evidence presented at trial was sufficient to support the jury's finding of the "especially heinous, atrocious or cruel" aggravating factor.

II.

Because McCracken's federal habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is governed by the provisions of the AEDPA. Wallace v. Ward, 191 F.3d 1235, 1240 (10th Cir. 1999), cert. denied, 530 U.S. 1216 (2000). Under the AEDPA, the appropriate

5

standard of review for a particular claim hinges on the treatment of that claim by the state courts. If a claim was not decided on the merits by the state courts (and is not otherwise procedurally barred), we may exercise our independent judgment in deciding the claim. See LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999). In doing so, we review the federal district court's conclusions of law de novo and its findings of fact, if any, for clear error. Id. If a claim was adjudicated on its merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2). "Thus, we may grant the writ if we find the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law; decided the case differently than the Supreme Court has on a set of materially indistinguishable facts; or unreasonably applied the governing legal principle to the facts of the prisoner's case." Van Woudenberg v. Gibson, 211 F.3d 560, 566 (10th Cir. 2000), cert. denied, 121 S. Ct. 1117 (2001).

## III.

*"Presumed not guilty" instruction*

McCracken contends he was deprived of his right to a fair trial when the trial

court instructed the jury that he was "presumed not guilty," rather than "presumed innocent," of the charged crimes. McCracken's counsel did not object to the "presumed not guilty" instruction at trial, nor did he raise the issue on direct appeal. The issue was first raised in McCracken's application for post-conviction relief, after the OCCA issued its decision in Flores v. State, 896 P.2d 558, 562 (Okla. Crim. App. 1995) (holding, in context of direct appeal, that use of the "presumed not guilty" instruction constituted reversible error). The OCCA concluded the issue was waived due to McCracken's failure to raise it on direct appeal. McCracken II, 946 P.2d at 674-75 (citing the 1995 amendments to Oklahoma's post-conviction procedure statute, Okla. Stat. tit. 22 § 1089 (1995)).

The threshold question we must address is whether, as asserted by the State, the issue is procedurally barred. "We will not consider issues on habeas review 'that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.'" Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999) (quoting English v. Cody, 146 F.3d 1257, 1259 (10th Cir.1998)), cert. denied, 531 U.S. 833 (2000). "'A state procedural ground is independent if it relies on state law, rather than federal law, as the basis for the decision.'" Sherrill v. Hargett, 184 F.3d 1172, 1174 (10th Cir.) (quoting English, 146 F.3d at 1259), cert. denied, 528 U.S. 1009 (1999). "To be adequate, a state's procedural rule must have been firmly established and

7

regularly followed when the purported default occurred." Clayton v. Gibson, 199 F.3d 1162, 1171 (10th Cir. 1999), cert. denied, 531 U.S. 838 (2000).

Our decision in Sherrill provides the answer to the procedural bar question. There, an Oklahoma state prisoner filed a pro se federal habeas petition challenging, among other things, a similar "presumed not guilty" instruction. We concluded the claim was procedurally barred due to the petitioner's failure to assert it on direct appeal. In doing so, we noted that "Oklahoma's procedural rule barring post-conviction relief for claims petitioner could have raised on direct appeal constitutes an independent and adequate ground barring review of petitioner's jury instruction claim." 184 F.3d at 1175. Because McCracken has offered no rational basis for distinguishing Sherrill, nor established cause and prejudice excusing his failure to raise the issue on direct appeal,[1] we conclude that his procedural default precludes federal habeas review.

Even if we were to overlook the procedural bar and address McCracken's arguments on the merits, we are not persuaded he would be entitled to federal habeas relief. McCracken first contends that the "presumed not guilty" instruction violated his constitutional rights and was a structural error not amenable to harmless error analysis. In Walker v. Gibson, 228 F.3d 1217 (10th Cir. 2000), cert. denied, 121 S. Ct. 2560

---

[1] In an attempt to establish cause and prejudice, McCracken argues that his counsel on direct appeal was ineffective for failing to challenge the "presumed not guilty" instruction. As we discuss below in addressing McCracken's request for an expanded COA, we find no merit to the argument.

8

(2001), we rejected similar arguments by an Oklahoma prisoner. Although we declined to decide whether the "presumed not guilty" instruction was unconstitutional, we held that any error resulting from the giving of such an instruction was amenable to harmless error analysis, and therefore did not constitute structural error.

Thus, the only remaining question is whether the error in this case, if any, was harmless. In deciding such questions, we ask whether the giving of the instruction had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 622 (1993); see Walker, 228 F.3d at 1236 (applying Brecht standard in identical circumstances). In light of the totality of the circumstances, including all of the first-stage jury instructions given by the trial court and the evidence presented during the first stage of trial, we are firmly persuaded that McCracken was afforded a "constitutionally fair trial." Walker, 228 F.3d at 1237. It was uncontroverted that four people were murdered during the course of a robbery and that McCracken was present during the robbery and murders. The only question of fact was the extent of McCracken's involvement in the crimes. The resolution of this factual issue required the jury to make a determination of credibility, i.e., whether to believe McCracken or Lawrence. In our view, the "presumed not guilty" instruction had little, if any, effect on this credibility determination. Indeed, we agree with the district court that "it was the jury's ability to weigh the veracity of the testimony of both [McCracken] and his co-defendant that was the determining factor in the jury's

9

decision of guilt, not the semantic difference between 'presumed innocent' and 'presumed not guilty.'" Order Denying Habeas Petition at 16-17.

*Ineffective assistance of counsel - penalty phase*

McCracken contends he was deprived of his right to effective assistance of counsel during the second-stage proceedings because his attorney failed to investigate and present available mitigating evidence concerning McCracken's "mental impairments, his family's history of mental impairments, and his deprived, abusive background." Aplt. Br. at ii. This issue was first raised by McCracken in his application for post-conviction relief. The OCCA concluded the claim was waived due to McCracken's failure to raise it on direct appeal. McCracken II, 946 P.2d at 676.

As an initial matter, we conclude the State's procedural bar is inadequate to preclude federal habeas review. In English, we outlined a framework for determining when the state procedural bar to an ineffective assistance of trial counsel claim is adequate for purposes of federal habeas review:

> [T]he Oklahoma bar will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone. All other ineffectiveness claims are procedurally barred only if Oklahoma's special appellate remand rule for ineffectiveness claims is adequately and evenhandedly applied.

146 F.3d at 1264. Here, neither of the English requirements is satisfied. McCracken

10

was represented on direct appeal by his trial counsel. Further, McCracken's claim of ineffective assistance cannot be resolved upon the trial record alone; rather, the claim relies heavily on mitigation evidence gathered after trial. Thus, we are free to review the claim de novo. See Romano v. Gibson, 239 F.3d 1156, 1180 (10th Cir. 2001).

McCracken's claim of ineffective assistance is governed by the familiar two-part test announced in Strickland v. Washington, 466 U.S. 668 (1984). Under that test, McCracken must establish that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. Id. at 688, 694; see also Kimmelman v. Morrison, 477 U.S. 365, 375 (1986). "Because [the adversarial] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, [the Supreme Court has] noted that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Kimmelman, 477 U.S. at 384 (quoting Strickland, 466 U.S. at 691). Unquestionably, counsel's obligation to conduct reasonable investigations extends to matters related to the sentencing phase of trial. See Cooks v. Ward, 165 F.3d 1283, 1294 (10th Cir. 1998), cert. denied, 528 U.S. 834 (1999). "Indeed, we have recognized a need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case." Id. Where counsel's alleged failure to investigate

11

and present evidence pertains to the sentencing phase of trial, the prejudice inquiry is whether there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Strickland, 466 U.S. at 695; see also Cooks, 165 F.3d at 1296 (requiring court to consider strength of government's case and aggravating circumstances jury found to exist, as well as mitigating factors that might have been presented).

McCracken contends his trial counsel should have investigated and presented "critical evidence about [his] and his family's history of mental problems and details regarding his abusive upbringing."  Br. at 29.  In particular, McCracken contends his counsel should have investigated and introduced the following information, all of which is contained in a report prepared by Dr. Dale Watson, a clinical psychologist who examined McCracken in June 1996 at the Oklahoma State Penitentiary: (1) evidence that McCracken's father, his paternal grandfather, and two aunts, had been diagnosed as having paranoid schizophrenia and bipolar disorder; (2) evidence that McCracken's father had an extensive history of alcoholism and violent behavior consistent with his paranoid schizophrenia; (3) evidence that McCracken's mother's second husband, James Wydner, was an alcoholic and physically abusive to McCracken's mother, which in turn led to confrontations between McCracken and Wydner; (4) evidence that McCracken was subjected to sexual abuse by an aunt, and

was also molested by an uncle over a period of several years beginning at age eight; (5) evidence that McCracken received outpatient treatment as a teenager and was diagnosed with "Adjustment Disorder with Mixed Disturbances of Conduct and Emotion"; (6) evidence that McCracken had been diagnosed with a number of psychiatric disorders including bipolar II disorder (recurrent major depressive episodes with hypomanic episodes), substance dependence, and borderline and antisocial personality disorders; and (7) evidence that McCracken had experienced multiple severe bouts of depression and had exhibited suicidal thoughts and tendencies.

In analyzing McCracken's claim, the first question is whether his trial counsel's performance was constitutionally deficient. Because the OCCA summarily rejected McCracken's claim on procedural grounds, there was no evidentiary hearing. Thus, the record on appeal contains no testimony from McCracken's trial counsel discussing his trial preparations and strategy. We are therefore left to glean what we can from the trial transcript.

A close examination of the trial transcript suggests that McCracken's trial counsel had several strategies for defending McCracken during the second-stage proceedings, and made some effort to investigate and present mitigating evidence. It appears that trial counsel relied heavily on a residual doubt strategy. McCracken testified during the second-stage proceedings and continued to deny that he was responsible for the murders. During second-stage closing arguments, trial counsel

13

argued that "[o]nly two people on this earth know [who the shooter was], Mr. McCracken and Mr. Lawrence," Tr. at 716, and that if the jury "entertain[ed] a doubt as to who did the shooting, [they] [could not] treat these gentlemen [McCracken and Lawrence] any different [in terms of punishment]." Id. at 724. Consistent with the residual doubt strategy, trial counsel also argued that McCracken did not create a great risk of death to more than one person because he could not have foreseen, when he allegedly gave the gun to Lawrence, that Lawrence would shoot anyone. Id. at 719 ("Did he know at that time he was creating a risk to more than one person?"). In addition to the residual doubt strategy, trial counsel attempted to refute the prosecution's allegation that McCracken represented a continuing threat to society. Specifically, trial counsel attempted to demonstrate that, in the incident that led to McCracken's prior conviction, McCracken was acting in self-defense. Likewise, trial counsel attempted to demonstrate that McCracken's difficulties while in jail pending trial (i.e., the fact that sheriff's officers discovered him carrying a small, homemade knife) were the result of threats he received from other prisoners. Trial counsel also attempted (through the testimony of McCracken and three of his relatives) to briefly outline the difficulties McCracken faced while growing up, presenting evidence that McCracken had only talked to his biological father on one occasion when he was fourteen, and that McCracken's stepfather was an alcoholic who physically abused McCracken's mother. Finally, trial counsel presented evidence that (1) McCracken

14

had attempted suicide on at least two occasions (once after his arrest on the prior felony counts and again while in jail pending trial on the murder charges), (2) after his first suicide attempt, he saw a psychiatrist who said nothing was wrong with him, (3) McCracken had strong relationships with his mother and one of his brothers, (4) McCracken was a decent soldier while serving in the Army, and (5) McCracken had experienced a religious conversion of sorts while in jail awaiting trial on the murder charges.

Given all of this evidence, we are reluctant to conclude that trial counsel's performance was constitutionally deficient. Because, however, there is insufficient evidence in the record to conclusively decide the issue, we will assume, for purposes of argument, that McCracken can satisfy the first Strickland requirement. The next question is whether trial counsel's deficient performance prejudiced McCracken.

After reviewing the psychological report submitted by McCracken in support of his claim, we are unable to conclude there is a reasonable probability that the outcome of the second-stage proceedings would have been different had the information contained in the report been presented to the jury. We are not persuaded that the information contained in the report concerning the psychological conditions of McCracken's father and other relatives (i.e., the fact that several relatives may suffer

15

from schizophrenia) would have had any effect on the jury.[2]  As for the information directly concerning McCracken, it is certainly conceivable that some of the information set forth in Dr. Watson's psychological report, most notably the information outlining the multiple psychological problems from which McCracken apparently suffered, could have been viewed by the jury as mitigating factors.  In light of the fact that the jury found the existence of six aggravating factors, however, we conclude that the mitigating effect of this evidence would not have produced a different outcome.  Simply put, we find it inconceivable that the jury, who otherwise found that McCracken murdered four unarmed people in an apparent attempt to prevent his arrest for commission of a robbery that netted $350, would have been persuaded to sentence McCracken to a term of imprisonment based simply on the diagnostic evidence contained in Watson's report.  Further, we believe that some of the information contained in Watson's report could have had a negative effect on the jury.  For example, Dr. Watson's report states that McCracken's "unpredictable, moody and impulsive characteristics are intensified when he drinks heavily.  He loses control of his resentments and anger under the influence of alcohol such that he can be irrational and violently destructive."  Watson Report at 9; see also id. at 21 ("He has a propensity to irritability and his control of aggression is significantly reduced under the influence

---

[2]  Watson appears to conclude, based on the results of a Rorschach test, that McCracken himself does not suffer from schizophrenia.  Watson Report at 12.

16

of alcohol."). Arguably, this evidence would have helped erase or reduce any lingering doubt the jury may have had concerning McCracken's role in the offense, and thus would have undercut trial counsel's residual doubt strategy. Similarly, this evidence arguably could have bolstered the jury's conclusion that McCracken represented a continuing threat to society (a factor that, as noted above, McCracken vigorously disputed during the second-stage proceedings).

For these reasons, we conclude that McCracken was not prejudiced by trial counsel's failure to investigate and present the psychological evidence now pointed to by McCracken. There is no basis for concluding he was denied his right to effective assistance of counsel.

*Meaning of "life imprisonment without parole"*

McCracken contends the trial court violated his right to due process by refusing to explain to the jury, in response to a note they sent out during their first-stage deliberations, what the term "life imprisonment without the possibility of parole" meant.[3] McCracken contends the trial court's response violated Simmons v. South

---

[3] During second-stage deliberations, the jury sent out a note asking: "Does life without parole mean exactly that? No chance of parole whatsoever? He would never, under any circumstances, get out of prison?" Tr. at 738. The trial court responded as follows: "I will instruct you again to look at your instructions. The law in Oklahoma provides a person convicted of murder in the First Degree is punishable by death, by life without parole or life. You may retire and deliberate further." Id.

17

Carolina, 512 U.S. 154 (1994), in which the Supreme Court held that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury--by either argument or instruction--that he is parole ineligible." Id. at 178 (O'Connor, J., concurring).

We have previously considered and rejected identical arguments asserted by other Oklahoma prisoners. In Mayes v. Gibson, 210 F.3d 1284, 1294 (10th Cir.), cert. denied, 531 U.S. 1020 (2000), we stated:

> The sentencing jury in Simmons was given a choice between life in prison and death, which, because the jury might have thought the defendant could be released on parole, "creat[ed] a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." (citation omitted). No such false choice was created here. The court instructed the jury on life, life without possibility of parole, and death. We believe this three-way choice fulfills the Simmons requirement that a jury be notified if the defendant is parole ineligible and defeats [petitioner's] claim.

That decision is controlling here and precludes federal habeas relief on this issue. See In re Smith, 10 F.3d 723, 724 (10th Cir. 1993) ("We cannot overrule the judgment of another panel of this court. We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court.").

*Sufficiency of evidence to support HAC aggravator*

McCracken contends the evidence presented during the second-stage

18

proceedings was insufficient to support the jury's second-stage finding that the deaths of McDaniels and Sheets were "especially heinous, atrocious or cruel."[4] McCracken first asserted this claim on direct appeal. The OCCA rejected it, stating: "The evidence shows that both victims were shot in the head and left to languish. Victim Sheets was semi-conscious and vomiting on himself when the police arrived at the scene. McDaniels was still alive and able to tell the police her name when they found her." McCracken I, 887 P.2d at 332. The question we must address is whether the OCCA's decision was reasonable.[5] See 28 U.S.C. § 2254(d)(1) and (2).

Although it made no mention of the standard of review it was applying, the OCCA presumably applied "the rational factfinder standard established in Jackson v. Virginia, 443 U.S. 307 (1979)." Hale v. Gibson, 227 F.3d 1298, 1335 (10th Cir. 2000), cert. denied, 121 S.Ct. 2608 (2001). That standard required the OCCA to view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the aggravator beyond a reasonable doubt.

---

[4] In light of the way the bill of particulars and the jury instructions were drafted, the jury had to find that the murders of both Sheets and McDaniels were especially heinous, atrocious or cruel. See, e.g., State Ct. R. at 220 (instructing the jury that the prosecution alleged "[t]he murders of Carol Ann McDaniels and Timothy Sheets were especially heinous, atrocious and cruel.").

[5] This court has not yet resolved whether a state appellate court's sufficiency-of-the-evidence inquiry involves a legal or factual determination. See Hale v. Gibson, 227 F.3d 1298, 1335 & n.17 (10th Cir. 2000). Because we would reject McCracken's claims under either standard, we find it unnecessary to decide the issue.

19

Jackson, 443 U.S. at 319. The OCCA also presumably applied its own definition of the "especially heinous, atrocious or cruel" (HAC) aggravator. "A murder is especially heinous, atrocious or cruel under Oklahoma law if it is 'preceded by torture or serious physical abuse. Torture includes the infliction of either great physical anguish or extreme mental cruelty, while physical abuse requires evidence of conscious physical suffering.'" Romano v. Gibson, 239 F.3d at 1176 (quoting Hale, 227 F.3d at 1335).

In deciding whether the OCCA's decision was reasonable, we first examine the evidence presented at trial. According to McCracken, Sheets and McDaniels were the third and fourth shooting victims. McCracken's testimony was bolstered by that of co-defendant Lawrence, who testified that the other victims were shot first. Bobby Nixon, the first policeman to enter the bar after the shootings, testified that Sheets was alive, convulsing, and appeared to have vomited on himself. Nixon testified, however, that Sheets seemed to be in a "semi-conscious state," and did not appear to hear or understand what Nixon was saying to him. Christopher Steele, another policeman who investigated the crime, testified that Sheets was breathing but appeared to be unconscious. Steele testified that he briefly spoke to McDaniels, who responded by telling him her first name. Steele testified that McDaniels was unable to respond to any other questions, and simply groaned and made "other noises." Karen Crosier, an emergency medical technician who responded to the scene and treated both victims, testified that Sheets had vomit on his face and, when she attempted to cut off his shirt

20

to examine him, he reached up and grabbed her arm "with a real tight grip." Tr. at 183. As for McDaniels, Crosier testified that she was talking, moving her arm, and saying that her arm hurt. Finally, Dr. Ronald Distefano, a forensic pathologist, testified that both Sheets and McDaniels died at the hospital from the gunshot wounds they received at the bar.

We conclude this evidence was constitutionally sufficient to support a finding that McDaniels' death was preceded by both extreme mental cruelty and conscious physical suffering. As the fourth and final shooting victim, McDaniels was undoubtedly aware of the first three victims' fate and, therefore, "it can be reasonably inferred that [s]he feared [s]he would be shot next." Turrentine v. State, 965 P.2d 955, 976 (Okla. Crim. App. 1998) (discussing the mental torture prong of the HAC aggravator). Further, there is little doubt the jury could have rationally concluded that McDaniels experienced severe pain and suffering following the gunshot wound to her head and prior to her death, since it was uncontroverted she was conscious and complaining of pain to the police and emergency medical technician who treated her.

As for Sheets, we conclude the evidence was constitutionally sufficient to support a finding that his death was likewise preceded by extreme mental cruelty. Given the circumstances of the crime, including the order of the shootings, the jury could have reasonably inferred that Sheets was aware of the shootings of the other victims, causing him to fear that he would be shot next. Under Oklahoma law, this was

21

sufficient to satisfy "the mental torture aspect of this aggravator." Id. Given this conclusion, we find it unnecessary to address the more difficult question of whether the evidence was constitutionally sufficient to support a finding that Sheets' death was preceded by conscious physical suffering.

For these reasons, we conclude the OCCA's determination that there was sufficient evidence to support the jury's finding regarding the HAC aggravator was reasonable under either 28 U.S.C. § 2254(d)(1) or (2).

*Enmund/Tison*

McCracken contends the trial court erred during the second-stage proceedings when it rejected his requested "triggerman" instruction. The requested instruction would have directed the jury to return a sentence of imprisonment unless they found, beyond a reasonable doubt, that McCracken "either killed . . . as charged in the Information . . . or that he attempted to kill . . . and intended that such killing take place, was a major participant in the felony committed combined with a reckless indifference to human life or that lethal force should be [employed]." St. Ct. R. at 413. The result of the trial court's refusal to give the tendered instruction, McCracken contends, was that the jury was not asked to determine whether he met the death eligibility standards announced in Enmund v. Florida, 458 U.S. 782 (1982) and Tison v. Arizona, 481 U.S. 137 (1987), and his death sentences are therefore unreliable under

22

the Eighth and Fourteenth Amendments.

McCracken raised this issue on direct appeal and it was rejected by the OCCA:

> In his thirteenth assignment of error, Appellant asks this Court to reverse his sentence of death because the trial court refused his requested "triggerman" instruction. Appellant relies on Enmund v. Florida, . . . and Tison v. Arizona, . . ., where the Supreme Court recognized that one who is convicted of first degree murder through the felony murder doctrine must be accorded an "individualized consideration as a constitutional requirement in imposing the death sentence." The issue is "whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life."
>
> It is noted that Appellant was charged in the alternative with malice aforethought murder and felony murder. The jury did not, and indeed is not required to, specify which alternative was the cause of the crime. See James v. State, 637 P.2d 862, 865 (Okl. Cr. 1981). Appellant argues that it is necessary to specify which alternative the jury found in order to determine whether there has been an Enmund violation, that is, if the jury found Appellant guilty of felony murder and not murder aforethought, then Enmund and its progeny apply.
>
> This Court was called to consider a similar argument in Hatch v. State, 662 P.2d 1377 (Okl. Cr. 1983), where the defendant was found guilty of two counts of murder based on the felony murder rule. This Court vacated the sentences of death and remanded for resentencing not inconsistent with Enmund. However, this Court agreed with the Supreme Court's assessment that in Oklahoma, a vicarious felony murderer may be sentenced to death absent an intent to kill, if sufficient aggravating circumstances exist. This Court recognized that the aggravating circumstances must outweigh the mitigating circumstances as provided in 21 O.S.1981, § 701.11. "Certainly the degree of participation in the entire chain of events may be presented in mitigation of the degree of punishment to be imposed. It is not, however, an absolute or conclusive mitigating factor." Hatch, supra, Footnote 4, Page 1383.
>
> We have considered this case in light of Enmund and find that any error in failure to give the "triggerman" instruction is harmless in light of the sufficient aggravating circumstances which outweigh the mitigating circumstances.

23

<u>McCracken I</u>, 887 P.2d at 331-32.

Enmund and Tison set forth a minimum level of criminal intent that must be proven by the prosecution before a criminal defendant can be sentenced to death. In Enmund, the Supreme Court held that death is not a valid penalty under the Eighth and Fourteenth Amendments for "one who neither took life, attempted to take life, nor intended to take life." 458 U.S. at 787. In Tison, the Court revisited the issue and held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." 481 U.S. at 158.

Here, it is clear that the Enmund/Tison culpability requirement was satisfied. McCracken was convicted in the first-stage proceedings of four counts of first degree malice murder. Although McCracken contends, and the OCCA apparently agreed, that he was charged alternatively with first degree malice murder and first degree felony murder with respect to each of the four victims, a review of the information demonstrates that McCracken was charged only with first degree malice murder (with an extra element unwittingly thrown in, i.e., that the first degree malice murder was committed during the commission of a robbery with a firearm).[6] Similarly, the first-

---

[6] For example, Count I (which is in all important respects identical to Counts II through IV) charged as follows:

> Jerry Lynn McCracken and David Keith Lawrence, on or about 10-14-90, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of Murder in the First Degree, by unlawfully,

24

stage jury instructions were drafted in such a manner that the jury, in order to find McCracken guilty of the four murders, necessarily had to find that he acted with malice aforethought.

Even assuming, for purposes of argument, that the information and first-stage jury instructions would have allowed the jury to find McCracken guilty of first degree felony murder, we are not persuaded there was a violation of the principles announced in Enmund and Tison. During the second-stage proceedings, the jury unanimously found, beyond a reasonable doubt, that McCracken knowingly created a great risk of death to more than one person. This finding, considered alone, is sufficient to satisfy the Enmund/Tison culpability requirement. See Tison, 481 U.S. at 158 (concluding that "major participation in the felony committed, combined with reckless indifference to human life is sufficient to satisfy the Enmund culpability requirement"); see also Hopkins v. Reeves, 524 U.S. 88, 100 (1998) (indicating that the prosecution may satisfy the Enmund/Tison requirements at any stage of the proceedings, including during sentencing or on appeal).

---

feloniously, and willfully while acting in concert each with the other with malice aforethought, during the commission of a robbery with a firearm, without authority of law, effect the death of Tyrrell Lee Boyd by shooting him with a firearm then and there and thereby inflicting certain mortal wounds in the body of said Tyrrell Lee Boyd from which mortal wounds the same Tyrrell Lee Boyd did languish and die on the 14th day of October, 1990.
St. Ct. R. at19.

25

For these reasons, we conclude the OCCA did not unreasonably apply Enmund or Tison in rejecting McCracken's arguments.

*Request for expanded COA*

McCracken has filed a motion asking us to grant him an "expanded" COA on one additional issue, i.e., "whether direct appeal counsel was constitutionally ineffective under the Sixth and Fourteenth Amendments for failing to claim that Petitioner's state and federal due process rights, as well as his statutory and other rights under Oklahoma law, were violated when the trial court instructed the jury that he was 'presumed not guilty' rather than 'presumed innocent.'" Application For Expanded Certificate of Appealability at 1. In order to receive a COA on this issue, McCracken must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. S 2253(c)(2). He can meet this standard if he shows that the issue "'[is] debatable among jurists, or that a court could resolve the issue[] differently, or that the question[] deserve[s] further proceedings.'" English, 241 F.3d at 1281 (quoting United States v. Sistrunk, 111 F.3d 91, 91 (10th Cir. 1997)).

Because we have repeatedly rejected similar arguments asserted by other Oklahoma state prisoners, e.g. Sherrill, 184 F.3d at 1175-76 (rejecting habeas petitioner's claim that appellate counsel was ineffective for failing to challenge "presumed not guilty" instruction on direct appeal), McCracken cannot demonstrate

26

that the issue is debatable among jurists, or that the issue deserves further proceedings. Even assuming, arguendo, that a COA were granted on the issue, it is clear that we would be bound by our prior decisions to deny relief on the issue.

The judgment of the district court is AFFIRMED.