**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DANNY WATSON,

      Petitioner-Appellant/Cross-
      Appellee,

v.

STATE OF WYOMING,

      Respondent-Appellee/Cross-
      Appellant.

No. 02-8005
No. 02-8008
(D.C. No. 99-CV-133-J)
(D. Wyoming)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **McWILLIAMS** and **LUCERO,** Circuit Judges.

      Petitioner Danny Watson, a Wyoming state prisoner, seeks a certificate of

appealability (COA) to challenge the district court's denial of his petition for writ of

habeas corpus.  The State of Wyoming cross-appeals, asserting the district court erred in

denying its motion to dismiss Watson's petition as untimely.  We exercise jurisdiction

pursuant to 28 U.S.C. § 1291, grant Watson's request for a COA, and affirm the judgment

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

of the district court.  We dismiss the State's cross-appeal as moot.

I.

On October 1, 1977, Watson was charged with the first-degree murder of an inmate in the Wyoming State Penitentiary.  He entered into a plea agreement whereby he agreed to plead guilty in exchange for the prosecution's promise and recommendation that he "forthwith, but in no event later than 60 days after the entry and acceptance by the Court of [the] guilty plea, be transferred . . . to a facility outside of the State of Wyoming, in the Federal System."  App. at 14.  The plea agreement also provided "that if the Court does not accept these recommendations, then I [Watson] have the right to withdraw the plea of guilty and reinstate my prior plea and stand trial on the charge against me."  Id. On September 5, 1978, the state district court conducted a sentencing hearing and accepted Watson's plea, stating:

> The Court, then, upon the written plea of guilty and the understanding which has been entered into . . . accepts the plea of guilty, accepts the negotiation which has been made and sentences the defendant to life imprisonment at the Wyoming State Penitentiary subject to the terms and conditions of [it] being the understanding of the Court that arrangements are being made for the transportation of the defendant to another institution.

Id. at 20.

On or about October 11, 1978, Watson was transferred to the federal prison system pursuant to a February 26, 1974, contract between the State and the Federal Bureau of Prisons.  Under the terms of that contract, the Federal Bureau of Prisons agreed to house Wyoming state prisoners in return for appropriate compensation.  The contract also

2

provided, in pertinent part, that the Federal Bureau of Prisons "may, upon two weeks notice to the State, terminate the commitment for any reason and the State agrees to accept delivery of the prisoner . . . and . . . return the prisoner to the jurisdiction of the State." Aplee. App. at 115.

Watson was initially housed at a federal penitentiary in Terre Haute, Indiana. At some point in 1980, he was transferred to a federal penitentiary in Marion, Illinois, due to his suspected involvement in organized drug trafficking at Terre Haute. In August 1981, he was transferred to a federal penitentiary in Lompoc, California. Watson "refused to enter the general population" on the grounds that he needed "to be separated from [certain] individuals in th[e] institution." Id. at 54. More specifically, he told officials at Lompoc that in 1976 he had "testified against a man who was accused of kidnapping and transporting the victim [across] a state line," and that certain inmates at Lompoc "kn[e]w about [his] situation," id. at 55, and "had placed a contract on his life." Id. at 59. Watson was therefore placed in administrative detention at Lompoc. On January 29, 1982, during an interview with a federal correctional official, Watson opined that he "w[ould] not be safe in any penitentiary or FCI in the Federal system." Id. In March 1982, he was transferred to a federal penitentiary in Lewisburg, Pennsylvania. He again refused to enter the general population on the grounds his life would be in jeopardy from certain other inmates, including black inmates from the District of Columbia who were allegedly interested in carrying out the contract on his life. Watson was again placed in

administrative detention.

On August 26, 1982, Watson was interviewed by a correctional officer at the Lewisburg facility who informed Watson "that a recommendation w[ould] be made to the Regional Office to return Mr. Watson to the State of Wyoming or transferred to another state facility" "due to his continued refusal to enter a general population within the Federal Prison System where black inmates from the District of Columbia are housed." Id. at 71. On September 6, 1982, Watson sent a letter to the interviewing correctional officer expressing his fear of returning to the State of Wyoming and "indicating that he now wish[ed] to enter the general population at" Lewisburg. Id. at 71-72; see id. at 73 (copy of letter). In September 1982, he was placed in the general population at Lewisburg.

On November 27, 1983, while still housed at Lewisburg, Watson was charged by prison officials with possessing a homemade knife. At a disciplinary hearing on December 2, 1983, he was found guilty of the infraction and sanctioned with 30 days' segregation. After serving his term in segregation, he again refused to enter the general population at Lewisburg and expressed fear for his life. In particular, he informed officials that "his life was in jeopardy over drug debts and because of the arrival [at Lewisburg] of another Wyoming state prisoner who [wa]s aware of Mr. Watson's previous cooperation with the state of Wyoming in a murder case." Id. at 90.

On April 6, 1984, the warden at Lewisburg prepared a memo recommending

4

Watson's "return[] to the custody of the state of Wyoming." Id. In support of his recommendation, the warden noted that Watson "has stated that he can no longer function in the general population of any federal institution and requests redesignation." Id. The warden further noted that, due to his involvement in drug trafficking and his refusal to enter the general population, Watson "has posed management problems at all the [federal] penitentiaries except Leavenworth," and would likely "refuse [to enter the general] population at the Leavenworth facility" as well. Id.

On May 2, 1984, federal prison officials sent a letter to the warden at the Wyoming State Penitentiary requesting that he "accept Mr. Watson back to the Wyoming State system or attempt to make other placement arrangements for him." Id. at 92. The letter opined that Watson could "no longer function in a Federal Bureau of Prisons institution." Id. On May 11, 1984, the warden at the Wyoming State Penitentiary acknowledged the letter and advised that he was "trying to locate suitable housing for [Watson] with another state institution under the interstate compact agreement." Id. at 93. Watson remained in the federal prison system (including a brief stay at the Leavenworth federal penitentiary) until October 5, 1984, when he was returned to the Wyoming State Penitentiary.

After spending one day in the Wyoming State Penitentiary, Watson was transferred to the Oregon State Penitentiary. While there, he was found guilty by prison officials of possessing drug paraphernalia. On March 23, 1989, he was returned to the Wyoming State Penitentiary because Oregon prison officials suspected his involvement in planning

5

an escape that may have included the use of weapons. On March 24, 1990, Watson was transferred from Wyoming to the Minnesota State Penitentiary. While in the Minnesota State Penitentiary, he was found guilty by prison officials of possessing an Exacto knife. On August 24, 1992, he was returned to the Wyoming State Penitentiary because Minnesota officials suspected his involvement in a planned escape. Since 1992, Watson has remained confined in the Wyoming State Penitentiary. During that time period, he has been investigated for involvement in an escape attempt or plan, has been found guilty of unauthorized use of a telephone, has been charged with possession of a handcuff key, and has tested positive for drug use.

Watson's first attempt at challenging his transfer out of the federal prison system occurred on September 6, 1989, when he sought habeas relief in Carbon County, Wyoming. That petition was dismissed on October 12, 1989, due to Watson's failure to challenge the jurisdiction of the sentencing court (the only ground upon which Wyoming law allows habeas relief to be granted, see Parkhurst v. Shillinger, 128 F.3d 1366, 1367 n.2 (10th Cir. 1997)). There is no indication in the record that Watson attempted to appeal the denial to the Wyoming Supreme Court.

Watson's second attempt at challenging his transfer out of the federal prison system occurred in 1995 when he filed in state district court a motion for "clarification" of the plea agreement. That motion was denied and again there is no indication in the record that Watson attempted to appeal the denial to the Wyoming Supreme Court.

Watson first sought federal habeas relief on October 27, 1995, when he filed a pro se petition for writ of habeas corpus in federal district court in Wyoming. The petition was dismissed without prejudice on July 22, 1997, on the grounds that Watson had failed to exhaust his state court remedies. More specifically, the court noted he could have sought withdrawal of his guilty plea in Wyoming state court pursuant to Wyoming Rule of Criminal Procedure 32(d).

On March 12, 1998, Watson filed in state district court a motion to withdraw his guilty plea. The State of Wyoming responded by claiming it had done everything it could to comply with the plea agreement but that Watson had personally breached the terms of the agreement as a result of his continual behavioral problems in the federal prison system and in the state prisons where he was transferred. The State asserted it was unable to house him outside the state because of his behavior. The state district court denied Watson's motion to withdraw his guilty plea on December 7, 1998. The court concluded that Watson had failed to establish "manifest injustice," as required under Wyoming state law for setting aside a plea agreement. See Wyo. R. Crim. P. 32(d) (stating if a motion to withdraw guilty plea is made after sentencing, "a plea may be set aside only to correct manifest injustice"). On April 7, 1999, the Wyoming Supreme Court dismissed Watson's appeal from the decision, concluding that both it and the state district court lacked jurisdiction to consider Watson's motion due to unreasonable delay between the entry of his guilty plea and the filing of his motion to withdraw the plea. In particular, the

7

Wyoming Supreme Court stated that "the Court adheres to the rule of promptness under which motions to withdraw guilty pleas must be made promptly, at the earliest possible moment." Id.

On June 29, 1999, Watson filed this federal habeas action alleging that the State of Wyoming had breached the 1978 plea agreement by confining him in the Wyoming State Penitentiary rather than a federal facility. The district court denied Watson's petition, concluding the State had not violated the terms of the plea agreement by returning Watson to the Wyoming State Penitentiary.

## II.

Because the district court denied Watson's request for a COA, we deem his notice of appeal, together with his appellate brief, as a renewed application for COA. See Fed. R. App. P. 22(b)(2). Issuance of a COA is jurisdictional. Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). A COA can issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327. After examining the record in this case, we conclude the issue presented by Watson is "adequate to deserve encouragement to proceed further." Id. Accordingly, we grant Watson a COA and proceed to the merits of his appeal.

8

III.

Watson's request for federal habeas relief is based on his assertion that the State breached the terms of the 1978 plea agreement by failing to ensure his permanent confinement in the federal prison system. Watson attempted to present this claim to the Wyoming state courts on three separate occasions, but never received a ruling on the merits from the Wyoming Supreme Court. Because the State does not argue on appeal that the claim is unexhausted or has been defaulted under Wyoming law, we are free to address it on the merits.[1] See Moore v. Gibson, 195 F.3d 1152, 1167 (10th Cir. 1999).

It is uncontroverted that, because Watson filed his petition in the district court after the effective date of AEDPA, the provisions of that Act apply to this appeal. See Hooks v. Ward, 184 F.3d 1206, 1213 (10th Cir. 1999). Under AEDPA, the appropriate standard of review depends on whether a claim was decided on the merits in state court. Where, as

---

[1] Even if the State had asserted a procedural bar argument, we would reject it. When the Wyoming Supreme Court dismissed Watson's motion to withdraw his guilty plea, it did so by engrafting onto Wyo. R. Crim. P. 32(d) a time limitation for the filing of a motion to withdraw a guilty plea. Importantly, this procedural rule was not firmly established or regularly followed at the time Watson filed his motion to withdraw his guilty plea in state district court. In particular, the Wyoming Supreme Court did not adopt the new time limitation until approximately the same time (March 1998) that Watson filed his motion and, for approximately three years thereafter, did not publish any decision officially announcing the rule. Thus, the rule was not "regularly followed when the purported default occurred." McCracken v. Gibson, 268 F.3d 970, 976 (10th Cir. 2001) (internal quotations omitted). Indeed, had the time limitation been in place and regularly applied, the federal district court that presided over Watson's first federal habeas petition would have been aware of the limitation and would not have concluded this was an available avenue of state relief for Watson.

9

here, a "claim was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, we review the district court's conclusions of law de novo and its findings of fact, if any, for clear error." LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999) (interpreting § 2254(d)).

"[A]pplicable Supreme Court precedent clearly holds the government accountable with regard to any promises made to induce a defendant to plead guilty." United States v. Cooper, 70 F.3d 563, 565 (10th Cir. 1995). In Santobello v. New York, 404 U.S. 257, 262 (1971), the Court held that when a defendant pleads to a charge in reliance on a promise or agreement by the prosecutor, that promise must be fulfilled or the defendant may withdraw his plea. Similarly, in Brady v. United States, 397 U.S. 742, 755 (1970), the Court held that a "plea of guilty entered by one fully aware of the direct consequences . . . must stand unless induced by . . . misrepresentation (including unfulfilled or unfulfillable promises") (internal quotations omitted).

Watson contended in district court and continues to assert on appeal that the 1978 plea agreement with the State required that he be *permanently* transferred into the federal correctional system. The district court rejected this proposition on two alternative grounds. First, noting that Watson's interest in a transfer was motivated by his fear of retaliation from the murder victim's friends who were housed at the Wyoming State Penitentiary, the court concluded that "a reasonable interpretation of the [agreement] [wa]s that the transfer was to last until the Wyoming State Penitentiary was a reasonably

10

safe place for Watson to serve his term." Aplee. App. at 15. Examining the evidence

presented by the parties, the court found that the State had complied with the agreement

as so interpreted:

> The Wyoming State Penitentiary has housed Watson since August 1992. At the hearing, Watson alleged that he was in danger at the Wyoming State Penitentiary, but presented no credible evidence of threats or attempted violence against him since his return. Watson stated that Roger Black, a friend of [the murder victim] was in the Wyoming Penitentiary, but also admitted that Black is in a different pod-grouping of prisoners. Since they are in different pods the two do not interact with each other and only cross paths occasionally.
> In light of Watson's frequent encounter with friends or associates of [the murder victim] in federal penitentiaries outside of Wyoming and his constant request for segregation from the general population because of these encounters, this Court finds that the Wyoming penitentiary is now as safe a prison as any other for Watson. . . . Therefore, the Court finds that Wyoming has not breached the plea agreement by bringing Watson back to Wyoming.

Id. at 15-16.

As its second ground for rejecting Watson's "permanent transfer" interpretation,

the district court concluded the 1978 plea agreement, like most other contracts, contained

an implied duty of good faith and fair dealing. The court further concluded that "Watson

breached his implied duty of good faith during his stints in federal penitentiaries outside

of Wyoming." Id. at 16-17. In support of this conclusion, the court cited various

documents generated by federal prison officials indicating their suspicions that Watson

had engaged regularly in a variety of illicit behavior (i.e., drug dealing, planning escapes,

possessing a weapon). Because Watson violated the implied duty of good faith, the

11

district court concluded, "Wyoming was and is unable to conform its conduct to the terms of the plea agreement." Id. at 18.

*Permanent transfer*

Watson challenges the district court's conclusion that the plea agreement did not require his permanent transfer into the federal correctional system. "General principles of contract law define the government's obligations under [a plea] agreement, looking to the express language and construing any ambiguities against the government as the drafter of the agreement." United States v. Guzman, 318 F.3d 1191, 1195 (10th Cir. 2003). "[A] two-step analysis" is employed "to determine whether the [government] violated a plea agreement." Id. First, the court must "examine the nature of the promise." Id. Second, the court must "evaluate the promise in light of the defendant's reasonable understanding of the promise at the time of the guilty plea." Id. at 1195-96.

Employing this analysis in light of the facts in the record, it is apparent that the key provision of the plea agreement, i.e., the provision providing for Watson's transfer to the federal prison system, is silent with respect to the intended length or permanency of the transfer. Although Watson contends the provision required that his transfer be permanent, we agree with the district court that this is not a reasonable understanding of the provision. Watson admitted at the evidentiary hearing under cross-examination by the State that no one promised his transfer to the federal prison system would be permanent, and no one promised him anything other than what was stated in the written plea

12

agreement. At a minimum, a reasonable understanding of the provision would take into account the possibility that it might be necessary for federal authorities, who were not parties to the plea agreement, to return Watson to Wyoming authorities for one reason or another. Moreover, it is reasonable, as concluded by the district court, that the transfer would last only as long as the threat of danger to Watson existed at the Wyoming State Penitentiary. In other words, it is reasonable that the State's obligation to house Watson in the federal prison system would cease if and when the threat of danger to him at the Wyoming State Penitentiary was equal to or less than the threat of danger in the federal prison system.

In a fall-back argument, Watson contends that even if the plea agreement is interpreted in this manner, the district court erred in finding that the Wyoming State Penitentiary "is now as safe a prison as any other for Watson." Aplee. App. at 16. According to Watson, the issue of the relative safety of the Wyoming State Penitentiary "was not argued by the state nor was it a matter that was extensively or meaningfully litigated or raised at the District Court level." Aplt. Br. at 23. Further, he contends "the evidence that was presented to the District Court established that [he] has a very real and reasonable fear for his continued safety in the Wyoming State Penitentiary." Id. In particular, Watson notes that one of his co-defendants, as well as the "co-defendant's running mate," are housed in a separate pod from Watson, but "regularly cross paths" with Watson when they "are moved from one area of the facility to another." Id. at 24.

13

Watson "believes that this regular contact will place him in a situation where he can be attacked by these or other inmates." Id.

Watson's arguments notwithstanding, we conclude the district court's factual findings were not clearly erroneous. The records of his confinement in the federal prison system indicate that he consistently complained of being in danger from other inmates and regularly asked to remain in administrative detention. On at least one occasion in 1982, he informed a federal correctional officer that he "w[ould] not be safe in any penitentiary or FCI in the Federal system." Aplee. App. at 59. As for the relative safety of the Wyoming State Penitentiary, the record fails to support Watson's assertion that he faces a substantial threat to his safety (at least more of a threat than he did in the federal prison system). He admitted during the evidentiary hearing that the inmates he feared were housed in separate pods at the Wyoming State Penitentiary, and he failed to present any evidence of attempted violence against him by those other inmates during his confinement in that facility.

*Implied duty of good faith*

Watson does not, and presumably cannot, challenge the district court's conclusion that the plea agreement imposed an implied duty of good faith on both himself and the State. See United States v. Frazier, 340 F.3d 5, 11 (1st Cir. 2003) ("[A]s in all contracts, plea agreements are accompanied by an implied obligation of good faith and fair dealing.") (internal quotations omitted). Instead, he complains that, in finding he

14

breached this duty, the district court relied on federal correctional officials' "suspicions" that he engaged in illicit behavior while housed in the federal prison system. According to Watson, such suspicions are insufficient to support a finding that he actually breached his duty of good faith, and the State of Wyoming instead must affirmatively prove that he engaged in the illicit behavior suspected by federal officials. He argues that "[t]o hold otherwise means that the actions of third parties, the federal penal authorities, would completely control [his] contractual rights." Aplt. Br. at 29.

Watson's arguments are not convincing for several reasons. Although there is no express mention of it in the plea agreement, the provision requiring his transfer to the federal penal system obviously hinged on federal authorities' willingness to accept and oversee him. In other words, Watson can point to nothing in the plea agreement, or any other evidence, preventing federal officials from transferring him back to Wyoming on the basis of proven or suspected illicit behavior. Thus, the federal authorities' opinions and conclusions regarding his behavior, whether or not substantiated by evidentiary hearings, were relevant to his continued ability to remain in the federal prison system. Further, not all of his problematic behavior while in the federal prison system was based on federal authorities' "suspicions." Only his involvement in organized drug trafficking appears to have been "suspected" rather than "proven" behavior. Aside from that suspected behavior, it was "proven" at prison disciplinary hearings that he possessed a homemade knife, refused to obey an order, and engaged in and encouraged group

15

demonstrations by inmates. It was also well established that he was a management problem for federal officials due to his continued refusal to enter the general population at the various federal prisons. Indeed, the evidence indicates that he admitted to federal officials on at least one occasion that he would not feel safe at any federal prison. In addition, to the extent the State had a duty to "prove" this problematic behavior at the evidentiary hearing before the district court, we conclude it carried its burden. Although Watson denied much of the illicit behavior during his testimony, it was well within the discretion of the district court to reject his testimony on the basis of lack of credibility and instead defer to the documentary evidence produced by the State (i.e., Watson's federal prison records). We conclude the district court did not err in finding that Watson breached the duty of good faith implied in the plea agreement.[2]

V.

Watson's request for a COA is GRANTED and the judgment of the district court is AFFIRMED. The State's cross-appeal is DENIED as moot.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[2] Our conclusions render moot the State's cross-appeal, which asserts the non-jurisdictional issue of whether Watson's federal habeas petition was filed within the one-year limitations period set forth in 28 U.S.C. § 2244(d). See Miller v. Marr, 141 F.3d 976, 978 (10th Cir. 1998) (holding § 2244(d)'s limitation period not jurisdictional).