No. 86–7054. JOHNSON v. OKLAHOMA. Ct. Crim. App. Okla. Certiorari denied.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting), I would vacate the judgment of the Oklahoma Court of Criminal Appeals insofar as it left undisturbed the death sentence imposed in this case. But even if I did not hold this view, I would grant this petition for certiorari for two reasons. First, the trial court incorrectly decided an unsettled question of law concerning an accused's right to the assistance of experts in preparing his defense. Second, the trial court's instructions at the sentencing hearing, in combination with the prosecutor's closing argument, deprived petitioner of his right to have the sentencing jury consider all of the mitigating evidence he offered.

I

Petitioner Malcolm Johnson was charged with the first-degree murder of Ura Thompson, an elderly woman who had been raped and suffocated in her apartment. Recognizing that the prosecution's case against petitioner rested largely on the opinion of a police chemist, who would testify that petitioner's hair, blood, semen, and clothing were consistent with physical evidence found in Thompson's apartment, petitioner's counsel requested the court prior to trial to appoint a chemist to aid in petitioner's defense. Counsel argued that a chemist was needed to challenge the police chemist's qualifications and testimony and to conduct an electrophoresis test, which even the prosecution conceded could show that petitioner was not the perpetrator of the crime. The trial court agreed with counsel that the appointment of a chemist was warranted, but denied the request on the ground that the Oklahoma Court of Criminal Appeals previously had rejected the view that criminal defendants were entitled to the assistance of such experts. Brief in Opposition 8.

At trial, the prosecution presented two kinds of evidence. First, the prosecution offered evidence showing that petitioner had in his possession at the time of his arrest several items missing from Thompson's apartment. Second, the prosecution pre-

sented the testimony of the police chemist. The prosecutor referred to the chemist's testimony as the "real crux" of the State's case against petitioner. *Id.*, at 15. The jury convicted petitioner of first-degree murder.

During a separate sentencing proceeding, defense counsel offered mitigating evidence relating to petitioner's personal background. Witnesses testifying on behalf of petitioner stated, for example, that petitioner's father frequently had beaten petitioner and his mother, that petitioner's parents eventually had separated, that petitioner had grown up in poverty, and that petitioner as a youngster had suffered from a mysterious and debilitating illness requiring a long hospital stay. Immediately after defense counsel offered this evidence, the trial court instructed the jury. As part of the charge, the trial court stated: "[Y]ou should not allow sympathy, sentiment or prejudice to affect you in reaching your decision. You should avoid any influence of passion, prejudice, or any other arbitrary factor when imposing sentence." *Id.*, at 19. After the delivery of these instructions, the prosecutor gave his closing argument, in which he ridiculed the mitigating evidence that petitioner's counsel had offered. The prosecutor stated:

> "I've got great empathy for his folks. But so what? . . . [H]is parents divorced when he was young. Oh, wow. . . . That's a mitigating factor for violent conduct. That's bologna *[sic]*. . . . Deprivation builds character. We ought to have fewer silver spoons in the mouths of our children and a little more deprivation. He wants to use that as a mitigating circumstance. . . . I was offended by what happened in this courtroom when the little children were placed on the witness stand to try to generate sympathy for a cold-blooded killer. . . . So what if he was sick or retarded: What's that got to do with—we're dealing with what he is today. . . . Not whether he had a disease when he was a baby, not whether he was mildly retarded at some time in his life." *Id.*, at 20–21.

At the close of the sentencing hearing, the jury recommended a sentence of death, and the court imposed that sentence.

## II

This Court long has acknowledged that when a State brings criminal proceedings against an indigent defendant, it must take

steps to ensure that the accused has a meaningful opportunity to present a defense. See, e. g., *Douglas* v. *California*, 372 U. S. 353 (1963); *Griffin* v. *Illinois*, 351 U. S. 12 (1956). Although the State need not purchase for an indigent defendant all of the services that the wealthy may buy, see *Ross* v. *Moffitt*, 417 U. S. 600, 616 (1974), the State must provide the defendant with the "basic tools of an adequate defense," *Britt* v. *North Carolina*, 404 U. S. 226, 227 (1971). We recently have begun to confront the questions whether and when expert assistance is such a basic tool. In *Ake* v. *Oklahoma*, 470 U. S. 68, 80 (1985), we recognized that when a defendant's mental condition is at issue, the assistance of a psychiatrist is "crucial to the defendant's ability to marshal his defense" and the State must therefore provide psychiatric assistance. A few months later, in *Caldwell* v. *Mississippi*, 472 U. S. 320, 323, n. 1 (1985), we reserved the equally important questions whether and when an indigent defendant is entitled to nonpsychiatric expert assistance. This case demonstrates the pressing need to consider and resolve those questions.

The denial of petitioner's request for the appointment of an expert chemist resulted in a fundamentally unfair trial in two respects. First, the denial prevented petitioner from raising doubts about the strength of the State's evidence against him. The prosecution's case against petitioner rested largely on the testimony of the police chemist that petitioner's bodily fluids, hair, and clothing comported with samples found at the scene of the crime. We previously have recognized that "'[t]estimony emanating from the depth and scope of specialized knowledge is very impressive to a jury.'" *Ake* v. *Oklahoma, supra*, at 81, n. 7 (quoting F. Bailey & H. Rothblatt, Investigation and Preparation of Criminal Cases § 175 (1970)). Without expert assistance, a defendant will usually be powerless to create doubts in the jury's mind about such testimony's strength or correctness. As Justice (then Chief Judge) Cardozo once stated, a defendant is "at an unfair disadvantage if he is unable because of poverty to parry by his own [expert] witnesses the thrusts of those against him." *Reilly* v. *Berry*, 250 N. Y. 456, 461, 166 N. E. 165, 167 (1929). Petitioner here was at such a disadvantage with respect to testimony that the prosecutor termed the "real crux" of the State's case. Second and equally important, the denial of the request for expert assistance prevented petitioner from gaining potentially conclusive exculpatory evidence in support of his affirmative alibi defense. As petition-

er's counsel explained to the trial court, petitioner desired expert assistance partly because he wanted to undergo a test that could have conclusively disproved his commission of the crime. In *Little* v. *Streater*, 452 U. S. 1 (1981), this Court held that a State's refusal to pay for a blood-grouping test in the context of a quasi-criminal proceeding to establish paternity violated the requirements of due process. Yet the trial court here effectively prevented an accused charged with a capital offense from gaining access to a similar kind of test. By denying petitioner the chance to obtain potentially conclusive exculpatory evidence, as well as by denying him the means to challenge the testimony of the police witness, the rejection of the request for expert assistance deprived petitioner of a meaningful opportunity to present a defense.

## III

In *California* v. *Brown*, 479 U. S. 538 (1987), this Court upheld a jury instruction cautioning jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial. In holding that the instruction did not suggest to the jury that it should disregard sympathetic aspects of the accused's background or character, the Court argued primarily that by cautioning the jury not to rely on *"mere* sympathy," the instruction directed the jury to ignore "only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." *Id.*, at 542. In a concurring opinion, JUSTICE O'CONNOR stated that although this jury instruction, taken alone, was constitutional, courts must recognize and guard against the possibility that instructions "attempt[ing] to remove emotion from capital sentencing," especially when combined with certain kinds of prosecutorial remarks, will mislead juries into thinking that they should ignore mitigating evidence about a defendant's background or character. *Id.*, at 545–546. I continue to believe that any instruction forbidding the sentencer to take sympathy into account "precludes precisely the response that a defendant's evidence of character and background is designed to elicit, thus effectively negating the intended effect of the Court's requirement that all mitigating evidence be considered." *Id.*, at 548 (BRENNAN, J., dissenting). But even under the majority's view in *Brown*, the instruction in this case, when considered in conjunction with the prosecutor's comments, diverted the jury from its

constitutional duty to consider all mitigating evidence introduced by the defendant at the sentencing phase of the trial.

The problem in this case arises both from the trial court's instruction to the jury and from the prosecutor's closing argument. The instruction cautioned the jury to disregard not *"mere* sympathy," but "sympathy" in general, which surely includes the sympathy deriving from petitioner's mitigating evidence. The prosecutor's closing argument emphatically endorsed the suggestion that the jury should disregard the mitigating evidence petitioner had offered. By consistently ridiculing the evidence relating to petitioner's background—by saying time and again "so what?"—the prosecutor indicated that such evidence was irrelevant to the sentencing determination. Thus, the conjunction of the court's antisympathy instruction and the prosecutor's closing argument diverted the jury from considering the factors of background and character that this Court has decreed a jury *must* take into account in reaching a sentencing determination.

## IV

The handling of this case almost ensured that petitioner would not prevail at either the guilt phase or the sentencing phase of his trial. The denial of the request for expert assistance deprived petitioner of a meaningful opportunity to contest his guilt. The court's antisympathy instruction and the prosecutor's closing argument denied petitioner a fair chance to challenge the appropriateness of the death penalty. Because I believe that the trial court unconstitutionally stacked the deck against petitioner at both stages of this capital proceeding, I would grant the petition for certiorari.