**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 13 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DANIEL JUAN REVILLA,

          Petitioner-Appellant,

v.

          No. 00-6244

GARY GIBSON, Warden,
Oklahoma State Penitentiary,

          Respondent-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-98-147-M)**

James L. Hankins of Hankins Law Office, Enid, Oklahoma, for
Petitioner-Appellant.

Sandra D. Howard, Assistant Attorney General, Chief, Criminal Appeals
(W.A. Drew Edmondson, Attorney General of Oklahoma, with her on the brief),
Oklahoma City, Oklahoma, for Respondent-Appellee.

Before **SEYMOUR** , **BALDOCK** , and **MURPHY** , Circuit Judges.

**MURPHY** , Circuit Judge.

## I. INTRODUCTION

In 1987, an Oklahoma jury found Daniel Juan Revilla guilty of first degree child abuse murder, Okla. Stat. tit. 21, § 701.7(C) (Supp. 1982). The jury also found two aggravating circumstances: "especially heinous, atrocious or cruel" conduct and "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The jury imposed death as punishment. The state trial court formally imposed judgment on Revilla *in absentia* , due to his escape from county jail shortly after trial.

Following his return to custody, Revilla unsuccessfully challenged his conviction and sentence on direct appeal and through state collateral review. *See Revilla v. State* , 877 P.2d 1143 (Okla. Crim. App. 1994); *Revilla v. State* , 946 P.2d 262 (Okla. Crim. App. 1997). Thereafter, in January 1998, he commenced this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. The district court ultimately denied his petition, and Revilla appealed. Upon a thorough review of the record in light of the arguments presented, we conclude Revilla is not entitled to habeas relief. Accordingly, as to all matters for which a certificate of appealability (COA) has been granted, we affirm the judgment of the district court; in all other respects, this appeal is dismissed pursuant to 28 U.S.C. § 2253(c).

## II. BACKGROUND

### A.  Factual Background

In its opinion resolving Revilla's direct appeal, the Oklahoma Court of Criminal Appeals (OCCA) summarized the basic facts immediately surrounding the death of the young victim, as well as the defense theory of how that death innocently occurred, as follows:

> Appellant was convicted of the child abuse murder of thirteen (13) month old Mark Gomez.  On January 26, 1987, Appellant took his girlfriend, Michelle McElmurry, to the Jackson County Health Department for a checkup.  The decedent, Michelle's son, was left alone at the house shared by Appellant and McElmurry.  Approximately 40 minutes later, Appellant ran through the lobby of the county hospital carrying the decedent in his arms, yelling that he had swallowed his tongue and was not breathing.  Subsequent attempts by hospital medical personnel were unsuccessful in reviving the unconscious infant.  Hospital personnel noticed numerous wounds and injuries to the decedent's body, including bruises on his back, blisters on his chest, peeling skin on his chest and groin area, burns on his thighs and ear, and lacerations on his thighs and arms.  The autopsy report showed a swelling and bleeding of the brain and the complete severance of the liver.

> The Appellant denied causing the decedent's death and explained that when he returned home from dropping Michelle off at the clinic, he saw the decedent laying on the floor.  The decedent was pale and appeared not to be breathing.  Appellant attempted to revive the decedent by striking him in the abdomen.  When decedent gasped for air, Appellant struck him again.  Unable to start him breathing, Appellant stated that he began to panic, grabbed the decedent, pulled his clothes off, rushed him into the bathroom, placed him in the tub, leaned over to turn on the cold water but accidently turned on the hot water, scalding the infant.  Turning the water off, he wrapped the decedent in a blanket, and in his rush out of the bathroom, struck the infant's head on the door frame.  Exiting the house in a hurry, he

tripped and fell on top of the decedent onto a concrete cellar. Appellant got up and rushed the decedent to the hospital.

*Revilla*, 877 P.2d at 1147. Contrary to Revilla's theory of defense, the OCCA specifically held the evidence "showed that [the victim's] injuries could not have occurred by accident, but were intentionally inflicted." *Id.* at 1155.

In reviewing Revilla's sentence, the OCCA again cited the victim's many injuries, and then recounted Revilla's repeated abusiveness toward the victim during the month leading up to the fatal incident, which it aptly characterized as "a time of terror, torture and abuse for the young decedent:"

> In addition to testimony that Appellant tried to fold decedent up in a hide-a-bed couch; that he put him in a kitchen drawer and closed the drawer; and that he taunted the 13 month old decedent by not letting him go to his mother, go to sleep or play with his toys, evidence also showed that the decedent was afraid of the Appellant and would cry and refuse to leave with him; that Appellant had said that he hated the decedent because he was not his child; that Appellant had slapped the decedent and thrown him on the floor; that on one occasion Appellant wrapped duct tape around the decedent's shoulders, threw him in a bathtub of cold water then hung him up by his heels; and on another occasion that Appellant wrapped his belt around the decedent and squeezed him.

*Id*. The OCCA accordingly "f[ou]nd the aggravator of 'especially heinous, atrocious or cruel' supported by sufficient evidence." *Id.* Further, the OCCA noted that Revilla had at one time been in "possession of a sawed-off shotgun and two machetes," and, more importantly, "had written [letters] from jail threatening Michelle McElmurry; the District Attorney; Juan Gomez, the decedent's father;

-4-

and Richard Taylor, McElmurry's then roommate, with physical harm and even death," and concluded that "[t]his evidence of [his] violent nature, together with the callous nature in which [he] killed Mark Gomez, support the jury's finding of the continuing threat aggravating circumstance." *Id.* at 1156. The OCCA therefore deemed "the sentence of death factually substantiated and appropriate." *Id.* "[F]inding no error warranting reversal or modification," the OCCA upheld Revilla's conviction and death sentence for first degree murder. *Id.*

**B.     Procedural Background and Motion to Expand COA**

After the denial of state post-conviction relief, Revilla filed the instant petition raising many claims, not all of which have been pursued in this appeal. The district court denied the petition but granted a COA on four claims: (1) Revilla lacked the necessary culpability for capital punishment recognized in *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987); (2) trial counsel provided ineffective assistance by failing to request a psychiatric expert to rebut the State's case on the continuing threat aggravator; (3) the heinous, atrocious, or cruel aggravator was not supported by the evidence and thus was unconstitutionally applied; and (4) the heinous, atrocious, or cruel aggravator merely duplicated elements of the offense and consequently failed to narrow the class of offenders eligible for the death penalty, as required by the Eighth Amendment.

This court conducted a case management conference at the outset of the appeal. After the conference, the COA was expanded to include two additional issues: (5) the pertinent evidence was insufficient to support the continuing threat aggravator; and (6) the trial court admitted improper expert testimony of personal opinion and statistical probabilities regarding the ultimate issue of guilt. [1]

## III. ANALYSIS

### A. Standard of Review

Revilla filed this habeas proceeding after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Consequently, as the district court recognized, federal review of the petition is governed by the standards set out in 28 U.S.C. § 2254(d) and (e), [2] as amended by

---

[1] Revilla has filed a second motion to expand the COA to add the claim that he was improperly refused an instruction on the lesser included offense of second degree manslaughter, contrary to *Hopkins v. Reeves*, 524 U.S. 88 (1998), and *Beck v. Alabama*, 447 U.S. 625 (1980). The OCCA denied this claim because such an instruction was not warranted by the record. *Revilla*, 877 P.2d at 1149-50. The district court agreed. Revilla has not demonstrated "that reasonable jurists could debate whether . . . the [claim] should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further," and, thus, he has not made the "substantial showing of the denial of a constitutional right" required by § 2253(c). *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation omitted). His motion to expand the COA is denied.

[2] The pertinent subdivisions of § 2254 provide as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits

(continued...)

AEDPA.  *Williams v. Taylor*, 529 U.S. 362, 402 (2000).  The Supreme Court construed the language of § 2254(d)(1) in *Williams*, which this court has summarized as follows:

> AEDPA allows a federal court to grant habeas relief under § 2254(d)(1) only if the relevant state-court decision was either "contrary to" or "an unreasonable application of" established Supreme Court precedent.  As for § 2254(d)(1)'s "contrary to" clause, [the Court] noted that a state-court decision would be contrary to the Court's clearly established precedent in two circumstances:  (1) the state court applies a rule that contradicts the governing law set forth in the Court's cases; or (2) the state court confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from the result reached by the Supreme Court.  Under the "unreasonable application" clause, on the other hand, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies the principle to the facts of the prisoner's case.

---

[2](...continued)
in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

> To be clear, under § 2254(d)(1)'s unreasonable application clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Thomas v. Gibson*, 218 F.3d 1213, 1219-20 (10th Cir. 2000) (citations, quotations, and associated alterations omitted).

These AEDPA principles require a state decision on the merits to which the federal courts can defer. *See* 28 U.S.C. § 2254(d) (limits on review in subsections (1) and (2) apply "with respect to any claim that was adjudicated on the merits in the State court proceedings"), § 2254(e)(1) (presumption of correctness attaches to "a determination of a factual issue made by a State court"). "To the extent that the state court has not addressed the merits of a claim and the federal district court made its own determination in the first instance, this court reviews the district court's conclusions of law de novo and its findings of fact, if any, for clear error." *Cannon v. Gibson*, 259 F.3d 1253, 1260 (10th Cir. 2001) (quotations omitted).

**B.     Guilt Phase Issues**

1. *Enmund/Tison* Claim

The Eighth Amendment prohibits "imposition of the death penalty on one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take

place or that lethal force will be employed." *Enmund*, 458 U.S. at 797; *see Tison*, 481 U.S. at 158 (clarifying that death penalty may be imposed on felony murder defendant who was not actual killer and who had no specific intent to kill, if evidence shows "major participation in the felony committed, combined with reckless indifference to human life"). Revilla contends that this principle bars imposition of the death penalty for his child abuse murder conviction, because "the State was not required to prove the element of intent to kill [or even reckless indifference], but was required [only] to prove that [he] 'willfully' or 'maliciously' injured, tortured, maimed or used unreasonable force upon the victim." *Revilla*, 877 P.2d at 1148.

This claim implicates some thorny procedural issues. The State insists it was procedurally defaulted. Actually, owing to the complicated and uncertain relationship this claim bears to other objections Revilla has advanced, it is not clear the claim was exhausted, much less raised and defaulted, in state court. [3] In contrast to its procedural complications, however, the claim may be disposed of in

---

[3] We also note that, on occasion, the OCCA has applied an exception to its default rule for claims involving "the sentencing to death of a person who is not eligible for the death penalty." *Hawkins v. State*, No. PC 96-1271, at 4 (Okla. Crim. App. Mar. 18, 1998); *see Clayton v. State*, No. PCD-2000-1618, at 5 n.5 (Okla. Crim. App. Dec. 22, 2000). While these unpublished decisions may not be binding authority, *see* Okla. Crim. R. 3.5(C)(3); *Howard v. State*, 738 P.2d 543, 545 (Okla. Crim. App. 1987), at the very least they reflect that Oklahoma does not now invariably apply its default rules to bar death-ineligibility issues such as the *Enmund* claim asserted here.

-9-

straightforward fashion on substantive grounds. We therefore invoke our discretion to bypass complex issues of exhaustion, *see* 28 U.S.C. § 2254(b), and procedural bar, *see Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir.), *cert. denied*, 531 U.S. 982 (2000), to reject the claim on the merits, which is also the course the district court followed. We review its decision de novo. *Cannon*, 259 F.3d at 1260.

It is essential, in applying *Enmund*, to appreciate a basic distinction the Supreme Court has drawn regarding the focus of its Eighth Amendment analysis. "*Enmund* does not concern the guilt or innocence of the defendant–it establishes no new elements of the crime of murder that must be found by the jury." *Cabana v. Bullock*, 474 U.S. 376, 385 (1986). Rather,

> *Enmund* holds only that the principles of proportionality embodied in the Eighth Amendment bar imposition of the death penalty upon a class of persons who may nonetheless be guilty of the crime of capital murder as defined by state law: that is, the class of murderers who did not themselves kill, attempt to kill, or intend to kill.

*Id*. Accordingly,

> when a federal habeas court reviews [an *Enmund* claim], the court's inquiry cannot be limited to an examination of jury instructions. Rather, the court must examine the entire course of the state-court proceedings . . . to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made.

*Id.* at 387. A state trial or appellate court may make the necessary intent finding, which is presumed correct under § 2254(e), "and unless the habeas petitioner can

-10-

bear the heavy burden of overcoming the presumption, the [federal] court is obliged to hold that the Eighth Amendment as interpreted in *Enmund* is not offended by the death sentence." *Id.* at 388.

The OCCA made the requisite finding of intent, albeit in a different legal context. While addressing the availability of lesser included offense instructions requested by the defense, the OCCA expressly found that the "evidence presented by the State showed that the decedent's death was the result of injuries intentionally inflicted by the Appellant *in a premeditated design to effect death*." *Revilla*, 877 P.2d at 1149 (emphasis added). The emphasized language certainly encompasses a culpability sufficient to satisfy the Eighth Amendment prescriptions of *Enmund* and *Tison*, and Revilla has not cited clear and convincing evidence to rebut this presumptively correct finding. *See* 28 U.S.C. § 2254(e)(1). Further, we see no reason why the mere fact that the finding was made in the context of a different issue should dilute its otherwise dispositive effect under *Cabana*.[4]

_____

[4]      Our decision to affirm on this appellate-finding rationale does not imply that an *Enmund* claim would otherwise necessarily be established on these facts. *Enmund*, a felony murder case in which the defendant did not kill the victim, held that the Eighth Amendment prohibits capital punishment "for one who *neither* took life, attempted to take life, *nor* intended to take life." *Enmund*, 458 U.S. at 787, 797 (emphasis added); *see Tison*, 481 U.S. 149-50 (explaining that after *Enmund*, "jurisdictions that limited the death penalty to" a "felony murderer who actually killed, attempted to kill, *or* intended to kill . . . could continue to exact

(continued...)

-11-

2. Admission of Expert Testimony

Revilla contends the state trial court improperly admitted certain testimony from two experts which was damaging to the defense. When, as in this case, no particular constitutional guarantees are implicated, such evidentiary objections merely raise questions of state law and, therefore, are cognizable on habeas only if the alleged error was "so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir.) (quotation omitted), *cert. denied*, 531 U.S. 938 (2000). With this federal standard in mind, we conclude that the state courts' resolution of Revilla's evidentiary objections was not unreasonable and, hence, those objections provide no basis for relief under § 2254(d)(1). *See Thomas*, 218 F.3d at 1225.

---

[4](...continued)
it" (emphasis added)). Since Revilla did in fact kill Mark Gomez, it is not clear that *Enmund* would undermine use of the death penalty here, whatever his intent. Indeed, several courts have specifically held that *Enmund* is inapplicable when the defendant was actively involved in killing the victim. *See, e.g.*, *Murray v. Delo*, 34 F.3d 1367, 1376 (8th Cir. 1994); *Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983). On the other hand, however, in *Loving v. Hart*, 47 M.J. 438 (C.A.A.F. 1998), the court noted "[n]either *Enmund* nor *Tison* involved an actual killer," concluded they "left unanswered . . . the question whether a person who 'actually killed' may be sentenced to death absent a finding that the person intended to kill," and held "the phrase, 'actually killed,' as used in *Enmund* and *Tison*, must be construed to mean a person who intentionally kills, or . . . exhibits reckless indifference to human life." *Id.* at 443. By rejecting Revilla's *Enmund* claim on the basis of *Cabana*'s appellate-finding principle, we merely avoid, rather than implicitly resolve, this debate.

-12-

On direct appeal and in the district court, Revilla challenged the testimony of three medical doctors, all of whom agreed that the nature and severity of the victim's injuries indicated they were not accidental. He does not now object to the testimony of Dr. John Steumky, which was the most damaging. Dr. Steumky stated that the injuries here were the type "we only see in beatings;" that the victim "certainly is a battered child;" that the victim "was literally beaten to a pulp and was killed;" that "[i]t absolutely defies the imagination to characterize these injuries [as] possible C.P.R.;" and that, as to the head injury, there was "no way" it could have been inflicted in the accidental manner explained by Revilla. Trial Tr. for Sept. 16, 1987, at 94-96, 104. Given this testimony, it is difficult to see how the other doctors' cumulative and far less forceful opinions, even if erroneously admitted, could possibly have been "so grossly prejudicial" as to have rendered Revilla's trial fundamentally unfair. *Fox*, 200 F.3d at 1296.

In any event, the OCCA held the opinions related by Dr. William Newland and Dr. Larry Balding were properly admitted, and Revilla has not shown that holding to be inconsistent with controlling evidentiary principles. Dr. Newland had assisted in emergency room attempts to revive the victim. He indicated that, based on information received from others regarding Revilla's account of events and his own observation of the victim, the victim's injuries were caused by

-13-

"non-accidental trauma."    *See* Trial Tr. for Sept. 14, 1987, at 94-101, 103-08.

The OCCA concluded:

> We find no error in the admission of Dr. Newland's testimony as that of an expert witness. Due to his education and experience, as set forth in the record, he was qualified to give an expert opinion as to the cause of the injuries. While he testified that he did not remember the exact people who gave him the background information on the decedent, Dr. Newland stated that his conclusions were based upon his clinical observations of the severity of the injuries, plus any available history of the victim. This testimony was properly admitted under 12 O.S. 1981, § 2702.

*Revilla* , 877 P.2d at 1150.

Revilla does not cite any contrary authority, but objects in conclusory fashion that the OCCA approved "baseless speculation" constituting an "extremely prejudicial personal expression of [his] guilt and an opinion on the ultimate issue of the validity of [his] theory of defense." Br. of Appellant, at 31. His objection to the foundation for Dr. Newland's opinion is plainly belied by the record and the quoted passage from the OCCA's decision. His objection that the opinion expressed a direct, conclusive position on the ultimate issue of guilt is undercut by Dr. Newland's specific clarification that by "non-accidental trauma" he meant only that the victim's injuries "would have had to have been inflicted and not the child doing it to himself." Trial Tr. for Sept. 14, 1987, at 103. Revilla's defense that he accidentally killed the victim is not necessarily opposed, much less definitively contradicted, by that statement.

-14-

Dr. Balding related the findings of a correlational study done at Michigan State University, to the effect that "[i]f you have a severe head injury especially with death of the child that in the vast majority of cases, . . . maybe ninety five percent I think was one figure[,] . . . this represented some form of child abuse." Trial Tr. for Sept. 15, 1987, at 112. He also said he "share[d] that opinion." *Id.* Revilla contends this testimony constituted "an unmistakable expert opinion of [his] guilt, stating a 95% probability that Mark was fatally injured in the course of child abuse," which "relieved the jury from deciding [his] guilt on the facts of this case." Br. of Appellant, at 31-32. The OCCA rejected this objection, noting that Dr. Balding's testimony "was an opinion on the cause of the decedent's injuries, not on [Revilla's] guilt;" that "[n]o undue emphasis was placed on the statistical figures;" and that Dr. Balding "was thoroughly cross-examined by [defense counsel]." *Revilla*, 877 P.2d at 1150-51 (also noting OCCA had previously "approved of testimony regarding professional studies of which an expert is aware").

We agree that the broad statistical finding related by Dr. Balding did not translate into a statement of Revilla's probable guilt. As Dr. Balding described it, the study was concerned with distinguishing "accident versus *inflicted* type injuries," and, in keeping with that limited focus, its conclusion was "basically that severe head injury in children does not result from what we call everyday

-15-

falls, from running, from falling off a bed, from falling off a couch." Trial Tr. for Sept. 15, 1987, at 112 (emphasis added). Again, Revilla's defense at trial did not involve denying he had caused injury; indeed, he specifically admitted bumping the victim's head into a door frame and landing on top of him as the two fell onto a concrete cellar. Thus, Revilla's own account indicated the victim's head injury fell into the "inflicted" category, rendering the study effectively superfluous on the point and at the same time providing an explanation which, if believed, contradicted the inference of guilt he now asserts that categorization necessarily compelled. For both these reasons, he cannot now claim the study obviated or overwhelmed the jury's particularized assessment of his guilt on the evidence presented.

**C.    Penalty Phase Issues**

1. <u>Duplication between Heinous, Atrocious, or Cruel Aggravator and Elements of Child Abuse Murder</u>

Revilla contends the heinous, atrocious, or cruel aggravator merely duplicated elements of child abuse murder and thus failed to narrow the class of offenders subject to capital punishment, as required by the Eighth Amendment. *See generally Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (holding capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence

-16-

on the defendant compared to others found guilty of murder") (further quotation omitted). On direct appeal, he challenged the constitutionality and application of the aggravator in several respects but not on the basis of duplication. When he did raise the latter objection on post-conviction, the OCCA declined to reach it, noting that "[i]nsofar as [the] current claim is the same as was raised on direct appeal, it is *res judicata*," and that "[a]ny difference in the claims renders the post-conviction claim waived." *Revilla*, 946 P.2d at 266. Accordingly, the State insists the claim is procedurally barred. Once again, however, we elect to avoid complex procedural bar issues and resolve the matter "more easily and succinctly" on the merits. [5] *Romero*, 215 F.3d at 1111.

---

[5] Revilla asserts ineffective assistance of appellate counsel as cause for his default of the duplication claim. In resolving the matter, the district court worked backward through procedural-bar analysis: first holding the duplication issue had no merit, then rejecting the ineffective assistance claim for lack of prejudice because the duplication issue would not have prevailed, and finally holding the duplication issue barred because its default was not excused by ineffective assistance. The State contends we can affirm that result on a more direct basis, without looking to the merits of the underlying duplication issue. Noting that the ineffective assistance claim raised here has not been exhausted (and arguing that it would now be barred), the State insists it cannot serve to excuse any default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (ineffective assistance claim asserted to excuse default must not be procedurally barred itself); *Murray v. Carrier*, 477 U.S. 478, 489 (1986) (ineffective assistance claim invoked asserted to excuse default must itself be exhausted). In any event, however, we note that the procedural-bar question would still be complicated, if not foreclosed, by the fact that we are dealing here with another death-eligibility challenge, potentially implicating the same procedural default exception applied by the OCCA in the *Hawkins* case, discussed above in connection with Revilla's *Enmund* claim.

-17-

The district court held the duplication claim could not succeed because (1) the heinous, atrocious, or cruel aggravator did not duplicate the elements of child abuse murder, and (2) even assuming it did, Revilla's death sentence could be upheld based on the jury's finding of an additional aggravator, i.e., that Revilla was a "continuing threat to society." While the second rationale reflects a misapplication of controlling law, [6] the first appears borne out by a comparison of Revilla's offense and the heinous, atrocious, or cruel aggravator.

The district court noted two distinctions between the offense and the aggravator. First, regarding the nature of the defendant's actions, the aggravator requires conduct that is "extremely wicked," "shockingly evil," "outrageously wicked and vile," "pitiless," "designed to inflict a high degree of pain" or involves "indifference to, or enjoyment of, the suffering of others." *Alverson v. State*, 983 P.2d 498, 516 (quotation omitted). Nothing in the offense replicates these extreme formulations. Second, regarding the violence done to the victim,

---

[6] *Clemons v. Mississippi*, 494 U.S. 738, 745 (1990) held that, in a state with a "weighing" capital sentencing scheme, an appellate court may properly affirm a death sentence, despite invalidating a predicate aggravator, if the court upholds the sentence "after itself finding that the one or more remaining aggravating factors outweigh the mitigating evidence." Here, the OCCA did not invalidate the heinous, atrocious, or cruel aggravator and thus had no occasion to engage in the "actual reweighing" allowed by *Clemons*. *See id.* at 752. In essence, the district court applied "a rule authorizing or requiring affirmance of a death sentence so long as there remains at least one valid aggravating circumstance," which *Clemons* specifically held was not permissible. *Id.* at 751-52.

the aggravator requires "torture" or "serious physical abuse" resulting in "conscious physical suffering." *Id.* at 515-16. The offense requires only "unreasonable force" or an "act which caused injury," provided death results. *Fairchild v. State*, 998 P.2d 611, 622 (Okla. Crim. App. 1999). Revilla's assertion that, because the abuse required for the offense must be *fatal*, it must as a practical matter satisfy the aggravator, is meritless. The victim's death, which for the offense need not be intended, does not necessarily establish the requisite callousness of the defendant or suffering of the victim. *See Malicoat v. State*, 992 P.2d 383, 399-400 (Okla. Crim. App. 2000) (rejecting similar claim of duplication between child abuse murder and heinous, atrocious, or cruel aggravator).

In any event, we discern a much more basic deficiency in Revilla's duplication claim. In *Lowenfield*, the Supreme Court clarified the constitutional requirement that a capital sentencing scheme "genuinely narrow the class of persons eligible for the death penalty," by explaining that

> the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

484 U.S. at 244, 246 (further quotation omitted). In short, "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death eligible persons," and there is "no reason why this

-19-

narrowing function may not be performed by jury findings at . . . the guilt phase."
*Id.* at 244-45. From these premises, the Court concluded that so long as "the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of [multiple] murder[,] . . . the fact that the aggravating circumstance [found at the penalty phase] duplicated [that] element[] of the crime does not make [a capital] sentence constitutionally infirm." *Id.* at 246.

This court has followed the same reasoning to hold that if an offense element adequately performs the necessary narrowing function, the Eighth Amendment is satisfied and it is immaterial whether that element happens to be duplicated by a specified aggravator. *See United States v. Chanthadara*, 230 F.3d 1237, 1261 (10th Cir. 2000); *United States v. McCullah*, 76 F.3d 1087, 1109 (10th Cir.), *reh'g denied*, 87 F.3d 1136, 1138 (1996) (en banc). Thus, the very premise of Revilla's duplication argument–that child abuse murder is so reprehensible that it effectively entails the material requirements of the heinous, atrocious, or cruel aggravator–logically forecloses his conclusion that the constitutional narrowing function was not properly effectuated in his case. [7]

---

[7] This court has recognized that the heinous, atrocious, or cruel aggravator, as narrowly construed by the Oklahoma courts, is adequate for Eighth Amendment purposes. *See LaFevers v. Gibson*, 182 F.3d 705, 721 (10th Cir. 1999).

## 2. Insufficient Proof of Heinous, Atrocious, or Cruel Aggravator

Revilla argues that the State failed to adduce sufficient proof of the heinous, atrocious, or cruel aggravator and that its consequent application to his case was unconstitutional. This claim was raised and rejected on his direct appeal. *See Revilla*, 877 P.2d at 1155. The controlling standard is whether any rational trier of fact could have found the aggravator beyond a reasonable doubt. *Hale v. Gibson*, 227 F.3d 1298, 1334-35 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 2608 (2001). [8]

The victim's death was undoubtedly preceded by serious physical abuse. The testimony, records, and physical evidence presented at trial clearly support the litany of injuries recited by the OCCA, which

---

[8] The proper standard for reviewing the OCCA's disposition under AEDPA, is, however, unsettled.

> If we treat the issue as a legal determination, we look to 28 U.S.C. § 2254(d)(1) and determine whether the state court decision was contrary to or an unreasonable application of clearly established federal law. If, on the other hand, it is a factual question, we look to § 2254(d)(2) and decide whether the state court determination was an unreasonable determination of the facts in light of the evidence presented to the state court. Further, § 2254(e)(1) requires us to afford a presumption of correctness to a state court's factual findings.

*Hale*, 227 F.3d at 1335 n.17. "Because we would reject [Revilla's] claims under either standard, we find it unnecessary to decide the issue." *McCracken v. Gibson*, 268 F.3d 970, 981 n.5 (10th Cir. 2001). Ultimately, the critical question is "whether the OCCA's decision was reasonable." *Id.* at 981.

included burns to the [victim's] cheek, ear, and upper thighs [and chest, from which the skin was actually peeling off when the victim arrived at the hospital]; lacerations on his arms; bruises on his back; head injuries, including a subdural hemorrhage which resulted in swelling of the brain, [9] and a complete transection of his liver.

*Revilla*, 877 P.2d at 1155.

The only issue concerns the requirement of conscious physical suffering. The medical evidence showed that the severe injuries inflicted on the morning the victim died, i.e., the transected liver, the head trauma, and the chest and leg burns, all occurred at or about the time of death, but no particular order was established. Further, the medical witnesses indicated that death or unconsciousness could have resulted immediately from either the liver or the head injury, and none of the witnesses offered an opinion whether the victim remained conscious.

Thus, the crucial question "is whether Oklahoma adduced sufficient evidence from which a reasonable fact finder could have concluded beyond a reasonable doubt that [the victim] was conscious during some part of the [abuse]." *Thomas*, 218 F.3d at 1227 (footnote omitted). The OCCA noted the uncertainties, but nevertheless concluded "that numerous severe injuries were

---

[9]     The severity of the head injuries should not be overshadowed by the fatal trauma to the liver. Medical evidence at trial indicated that the head injuries alone could possibly have resulted in death and would certainly have resulted in profound brain damage.

-22-

inflicted upon the decedent prior to his death and that the decedent suffered pain before his death." *Revilla*, 877 P.2d at 1155. The first half of that statement, regarding the infliction of serious multiple injuries prior to the victim's death, is certainly a reasonable conclusion on the evidence recited. But injury before death does not constitute conscious suffering, particularly in a case such as this, when one or more of the victim's injuries could have caused the immediate loss of consciousness and there is no evidence suggesting the order in which the injuries were inflicted.

We need not definitively accept or reject any purported inferential link between multiple injuries and conscious suffering here, because there is an independent basis in the OCCA opinion for its finding of conscious suffering. Specifically, the OCCA cited the month-long period of torture and physical abuse preceding the fatal incident as "[f]urther evidence supporting this [heinous, atrocious, or cruel] aggravator." *Id.* at 1155. The possibility of relying on abuse temporally removed from the immediate circumstances causing the victim's death raises several questions primarily involving state law.

The initial question is whether evidence of such abuse is even admissible to prove conscious suffering for purposes of the heinous, atrocious, or cruel aggravator. Since its opinion in *Revilla*, the OCCA has held that evidence of prior child abuse inflicted up to nineteen days before the victim's death is

-23-

admissible to prove serious physical abuse and torture for purposes of the heinous, atrocious, or cruel aggravator, provided the abuse was part of "a continuing course of conduct." [10] *Malicoat*, 992 P.2d at 399.

The next question is whether Revilla's pre-murder abuse of the victim falls under this continuing-course-of-conduct principle. We think it does. The multiple incidents involved here occurred over a fairly short span of time, which the OCCA itself characterized as "a time of terror, torture and abuse for the young decedent," *Revilla*, 877 P.2d at 1155. These events are certainly comparable in this respect to the continuing course of conduct the OCCA recognized in *Malicoat*.

The more difficult question is whether such abuse is alone sufficient to satisfy the conscious-suffering requirement of the heinous, atrocious, or cruel aggravator. The OCCA did not have to decide this question in *Malicoat*, in which the aggravator was supported by expert testimony describing the victim's likely suffering at the time of death and the defendant's own admission that the victim

---

[10] Revilla contends this holding "skews the common understanding of what is meant by death being preceded by conscious physical suffering." Reply Br. at 17. Because the meaning of the aggravator is a matter of state law, however, we defer to the OCCA's authoritative construction. *See Davis v. Executive Dir. of Dep't of Corr.*, 100 F.3d 750, 771 (10th Cir. 1996); *Zeitvogel v. Delo*, 84 F.3d 276, 283 (8th Cir. 1996). Only then do we move on to determine whether this construction unravels the OCCA's previous constitutional narrowing of the heinous, atrocious, or cruel aggravator to circumstances of conscious suffering, *see generally Thomas*, 218 F.3d at 1226.

-24-

had screamed in pain as he hit her. [11] *See Malicoat*, 992 P.2d at 398-99. If such abuse is *admissible to show* the conscious suffering required for the aggravator, however, it must necessarily be *probative* on the issue; and, if sufficiently probative, it need not be combined with other evidence of conscious suffering contemporaneous with or immediately preceding death. Thus, *Malicoat*'s rationale, if not its specific holding, necessarily establishes that pre-murder abuse, which is not contemporaneous with death, can alone be sufficient to establish the conscious suffering element of the heinous, atrocious, or cruel aggravator.

With that legal premise established, we have no difficulty concluding that, as a factual matter, the month-long course of "terror, torture, and abuse" Revilla inflicted on the victim in this case, [12] *see Revilla*, 877 P.2d at 1155, satisfies the conscious suffering requirement. Indeed, while the particular facts pertinent to the aggravator are unavoidably unique to each case, *see Phillips v. State*, 989 P.2d 1017, 1039 (Okla. Crim. App. 1999), the abuse in question here was comparable in severity to that supporting the heinous, atrocious, or cruel aggravator in

---

[11]    In *Malicoat*, the question of pre-murder abuse arose from the defendant's objection that such evidence had improperly prejudiced his penalty-phase proceedings. *Malicoat*, 992 P.2d at 399. Thus, the OCCA had only to hold that the evidence was admissible for purposes of the aggravator; whether the evidence was alone sufficient to establish conscious suffering was not in issue.

[12]    Injuries associated with the continuing abuse noted by the OCCA in this case included severe burns on the victim's ears, as well as bruises and abrasions to various parts of his body.

-25-

numerous other cases, where the injuries were inflicted immediately before the victim died or lost consciousness. [13] *Cf., e.g.,* *Medlock v. Ward*, 200 F.3d 1314, 1317 (10th Cir.), *cert. denied*, 531 U.S. 882 (2000); *Hooks v. Ward*, 184 F.3d 1206, 1240 (10th Cir. 1999); *Fairchild*, 998 P.2d at 628; *Willingham v. State*, 947 P.2d 1074, 1085 (Okla. Crim. App. 1997); *Smith v. State*, 932 P.2d 521, 535 (Okla. Crim. App. 1996).

Our inquiry, however, must proceed beyond mere analysis of Oklahoma law to resolve whether the heinous, atrocious, or cruel aggravator, under the circumstances of this case, continues to adequately narrow the class of persons eligible for the death penalty consistent with the Eighth Amendment. *See* *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (explaining aggravating circumstance "may not apply to every defendant convicted of a murder; it must apply only to a subclass of [such] defendants"). To resolve that inquiry, we compare the scope of the statutory offense with that of the aggravator.

The child abuse murder statute applies to any defendant who willfully "used unreasonable force upon a minor child" or "committed any act which

---

[13]  Revilla argues in passing that the State did not prove he had inflicted the earlier abuse. The record contains ample evidence, both direct and circumstantial, tying him to the course of abuse summarized by the OCCA. *See Revilla*, 877 P.2d at 1155. Indeed, on direct appeal, Revilla objected to the prejudicial effect of the evidence admitted to show his commission of "other crimes/bad acts" injurious to the victim. *Id.* at 1152.

caused injury to a minor child," whenever such force or act "resulted in the death of that child." *Fairchild*, 998 P.2d at 622. The heinous, atrocious, or cruel aggravator narrows this broad class of offenders by requiring (1) that the victim consciously suffer serious abuse or torture and (2) that the offender's conduct reflect wickedness, pitilessness, or deliberate infliction of, indifference to, or enjoyment of suffering. *Alverson*, 983 P.2d at 516. Even if the conduct considered under these constraints is expanded to include physical abuse not contemporaneous with death but part of a continuing course of conduct culminating in the fatal abusive incident, the aggravator would still significantly narrow the class of defendants eligible for the death penalty by excluding those who have caused the death of a child through a single or isolated incident of violence. This narrowing continues to reasonably justify the more severe punishment of those who qualify.

Finally, consideration of conduct which is not contemporaneous with the murder is not generally prohibited under the Eighth Amendment. For example, Oklahoma's "prior violent felony" and "continuing threat" aggravators have supported numerous death penalty verdicts without constitutional difficulty. *See Trice v. Ward*, 196 F.3d 1151, 1172-73 (10th Cir. 1999); *Boyd v. Ward*, 179 F.3d 904, 922 (10th Cir. 1999). *See generally Tuilaepa*, 512 U.S. at 977 ("Both a backward-looking and a forward-looking inquiry are a permissible part of the

[capital] sentencing process, . . . and the States have considerable latitude in determining how to guide the sentencer's decision in this respect.").

In sum, Revilla's continuing course of pre-murder abuse of the victim was admissible to show the conscious suffering required for the heinous, atrocious, or cruel aggravator; this evidence was sufficient to satisfy the State's burden; and the OCCA's application of the aggravator on the facts of record was consistent with governing constitutional principles. We therefore reject Revilla's claim that the heinous, atrocious, or cruel aggravator was impermissibly applied to his case.

3. Insufficient Proof of Continuing Threat Aggravator

This claim was raised and rejected on the merits in Revilla's direct appeal. *See Revilla*, 877 P.2d at 1155-56. Again, the controlling standard is whether any rational trier of fact could have found the aggravator beyond a reasonable doubt, *Hale*, 227 F.3d at 1334-35 (10th Cir. 2000), and, under AEDPA, we ask only "whether the OCCA's decision was reasonable." *McCracken*, 268 F.3d at 981.

The OCCA affirmed the jury's finding of a continuing threat on the basis of the callousness reflected in Revilla's abusive conduct toward the victim, the implication of violence in his possession of two machetes and a sawed-off shotgun, and, most importantly, the express threats of violence and death he made regarding the victim's mother and her roommate, the victim's father, and the district attorney. *See id.* at 1156. The district court concluded that this evidence

was sufficient, under the controlling habeas standards, to support the finding upheld by the OCCA, and we agree.

Revilla contends, however, that the OCCA's decision is inconsistent with *Ochoa v. State*, 963 P.2d 583 (Okla. Crim. App. 1998), which invalidated a continuing threat finding because "the State [had failed to] present sufficient evidence concerning prior convictions or unadjudicated crimes to show a pattern of criminal conduct that will likely continue in the future." *Id.* at 603 (quotation omitted). Revilla reads too much into *Ochoa*, which held only that the particular evidence of prior criminal conduct in that case was insufficient to establish the continuing threat aggravator. "Contrary to [Revilla's] contention, a pattern of criminal activity is not *required* to prove this aggravator." *James v. Gibson*, 211 F.3d 543, 559 (10th Cir. 2000) (noting other types of evidence which may support aggravator) (emphasis added), *cert. denied*, 531 U.S. 1128 (2001). Revilla also insists there is no principled factual distinction between *Ochoa* and this case, because "like [his] case, the State proved simply that Ochoa engaged in a single act of violence." Br. of Appellant, at 39. This argument is plainly belied by the distinctive facts here, including Revilla's pattern of child abuse and his threats of violence after the murder. Indeed, the latter seem uniquely probative on the question of future violence and, indeed, the OCCA has relied on such threats to support the aggravator on numerous occasions. *See Torres v. State*, 962 P.2d 3,

23 n.98 (Okla. Crim. App. 1998) (citing several cases expressly relying on threats of harm or death); *see also James*, 211 F.3d at 559 (noting "threats against others are among the factors which may be considered in determining if there was sufficient evidence to support the continuing threat aggravator").

    4. <u>Ineffective Assistance of Counsel (Failure to Request *Ake* Expert)</u>

Revilla contends that he was entitled to a psychiatric expert to rebut the State's case on the continuing threat aggravator, *see Ake v. Oklahoma*, 470 U.S. 68 (1985), and that trial counsel's failure to request an expert constituted ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984). He did not, however, raise this issue until his post-conviction proceeding, at which time he claimed both that trial counsel was ineffective for failing to request an expert and that appellate counsel was ineffective for failing to raise trial counsel's omission. The OCCA held the trial ineffectiveness claim was defaulted, because it "relie[d] on facts which [could have been] discerned from a review of the record and upon facts within Petitioner's own personal knowledge." *Revilla*, 946 P.2d at 265 (also holding default not excused by appellate ineffectiveness claim, which court rejected on merits). As Revilla was represented by new counsel on direct appeal, the OCCA's ruling might, at first blush, appear to provide an adequate basis for procedural bar under *English v. Cody*, 146 F.3d 1257, 1264 (10th Cir. 1998).

However, Revilla's trial ineffectiveness claim relies on a psychiatric report and affidavits which were not a part of the record on direct appeal. In such circumstances, we have held "[t]he State's procedural bar . . . is inadequate to preclude federal habeas review [under *English* ]." *Romano* , 239 F.3d at 1180. We therefore proceed to the merits. Under the circumstances, we do not have a state court disposition of the trial ineffectiveness claim for purposes of AEDPA. [14]

Revilla's claim is *not* that he was denied an expert, but that counsel was ineffective for failing to request one. The latter claim does not turn on whether

---

[14]     We recognize that the OCCA rejected Revilla's appellate ineffectiveness claim because, in its view, the underlying trial ineffectiveness claim would not have prevailed. However, this indirect assessment of the trial ineffectiveness claim was tainted by an improper legal standard. The OCCA misread *Lockhart v. Fretwell* , 506 U.S. 364 (1993), to add a new element to *Strickland* 's prejudice test, so that a reasonable likelihood of a different outcome was not enough to warrant relief unless the original outcome was in some additional sense "fundamentally unfair or unreliable." *Revilla* , 946 P.2d at 265. The Supreme Court has repudiated this view, explaining that *Strickland* 's outcome-alteration test still controls "virtually all ineffective-assistance-of-counsel claims" and that *Lockhart* is implicated only in the exceptional case where the different outcome posited for purposes of *Strickland* would ultimately be attributable to an error of law or some other impropriety. *See Williams* , 529 U.S. at 391-92; *Tucker v. Catoe* , 221 F.3d 600, 608 (4th Cir.) ( *Williams* "dismissed the idea that we must separately inquire into fundamental fairness even if a petitioner is able to show that his lawyer was ineffective and that the ineffectiveness probably affected the outcome of the proceeding"), *cert. denied* , 531 U.S. 1054 (2000). Because the OCCA discounted the trial ineffectiveness claim under an improperly heightened standard, we resolve the claim unconstrained by AEDPA deference. *See Romine v. Head,* 253 F.3d 1349, 1365 (11th Cir. 2001); *Copperwood v. Cambra* , 245 F.3d 1042, 1046 (9th Cir.), *cert. denied* , 122 S. Ct. 228 (2001); *Mask v. McGinnis* , 233 F.3d 132, 140 (2d Cir. 2000), *cert. denied* , 122 S. Ct. 322 (2001).

-31-

the law and evidence mustered in this habeas proceeding establish Revilla's right to an expert, but on whether counsel acted below professional standards in failing to request an expert on the basis of the law and facts available to him in 1987. *See, e.g.*, *Moore v. Marr*, 254 F.3d 1235, 1243 (10th Cir. 2001); *Stouffer v. Reynolds*, 168 F.3d 1155, 1162 (10th Cir. 1999).

The state of the law in 1987 clearly undercuts the ineffective assistance claim. *Ake* held only that an indigent capital defendant must, upon request, be provided an expert for the penalty phase "when the State presents psychiatric evidence of the defendant's future dangerousness." [15] 470 U.S. at 83. Strictly applying *Ake*, Oklahoma courts initially recognized this right only when the State presented its own penalty-phase expert, which it did not do here. *See Brewer v. State*, 718 P.2d 354, 363-64 (Okla. Crim. App. 1986). This circuit later extended *Ake* to require an expert if the State puts on *any* evidence, psychiatric or otherwise, of future dangerousness, so long as the defendant's mental condition would likely have been a significant mitigating factor. *See Liles v. Saffle*, 945 F.2d 333, 341 (10th Cir. 1991); *Rogers v. Gibson*, 173 F.3d 1278, 1285 (10th Cir. 1999). Oklahoma ultimately adopted this broader view in *Fitzgerald v. State*, 972

---

[15]     We note that the Supreme Court has been reticent to provide any further guidance on the scope of *Ake*. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985); *Johnson v. Oklahoma*, 484 U.S. 878, 880 (1987) (Marshall, J., dissenting from denial of certiorari).

P.2d 1157, 1169 (Okla. Crim. App. 1998). Against this legal backdrop, we cannot say counsel's failure to request an expert was professionally unreasonable in 1987, at a time when *Ake* itself did not establish the validity of such a request, state case law rejected it, and even this circuit's extension of *Ake* would not take place for several years.

The known and knowable facts in 1987 also undercut the ineffective assistance claim. The pertinent sentencing facts known to trial counsel and shown by the record [16] were that Revilla's parents were divorced, that Revilla's father was an irresponsible drinker, and that Revilla had essentially made his own way in life since his early teens. These matters may have been helpful by way of general mitigation and, indeed, were mentioned in this regard at trial. They do not, however, establish that counsel should have recognized "a mental status exam would produce mitigating evidence," which is the factual prerequisite for the ineffective assistance claim Revilla now asserts. *Romano*, 239 F.3d at 1182 (rejecting claim that trial counsel was ineffective for failing to pursue psychiatric evaluation); *see also Mayes v. Gibson*, 210 F.3d 1284, 1289 n.3 (10th Cir.) (same), *cert. denied*, 531 U.S. 1020 (2000).

---

[16] Revilla refers to additional facts, allegedly "available" to counsel, shown by affidavits introduced in later post-conviction proceedings, but he has failed to demonstrate that trial counsel knew or reasonably should have known about these additional matters.

-33-

In sum, the parties' focus on *Strickland* prejudice, and their associated mistaken reliance on current facts and legal authorities not available to counsel in 1987, has diverted attention from a proper contextual assessment of Revilla's ineffective assistance claim. Pursuant to such an assessment, we reject the claim based on Revilla's failure to demonstrate constitutionally deficient performance by counsel.

## IV. CONCLUSION

For the reasons set forth above, this court concludes that none of the grounds asserted herein warrant habeas relief. With respect to the objection regarding instruction on lesser included offenses, Revilla has failed to make the threshold "substantial showing of the denial of a constitutional right," and is, therefore, DENIED a certificate of appealability under § 2253. As to all other issues before the court, the judgment of the district court is AFFIRMED.